Mr. Justice FIELD,
with whom concurred Mr. Justice CLIFFORD, dissenting.
I am unable to agree with the majority of the court in the judgment just rendered in this case, and will state, with as much brevity as possible, the grounds of my disagreement.
The case was brought for the forfeiture of personal property belonging to the appellant, and is founded upon what is termed the Confiscation Act of July 17th, 1862. There is, it is true, a count in the libel upon the act of August- 6th, 1861, but no reliance has been placed upon it to support the forfeiture. The case has proceeded upon the theory that the stock, alleged to have been seized by the marshal, was ' in Michigan, and had been there since it was issued, a period anterior to the rebellion, and, of course, to the passage of the act in question, a position inconsistent with any claim that the property had been subsequently purchased to be fused, or had been used, in aiding, abetting, or promoting the rebellion. No further attention will therefore be given to that act.
Í shall direct my attention, in the first place, to the validity of the legislation embodied in the act of July 17th, 1862, and then assuming that legislation to be valid and in accordance with the Constitution, shall consider whether the proceedings in the case are iu conformity with its requirements.
, The authority for the legislation in question must be found in what are termed the war powers of. the government; which, so far as they touch upon the present subjects of inquiry, are the power to declare war, to suppress insurrection, and to make rules concerning captures on land and water; or, in what is termed the municipal power of the government to legislate for the punishment of offences against the United States.
It has been held, that when the late rebellion assumed the proportions of a territorial civil war, the inhabitants of the *315 Confederate States, and the inhabitants of the loyal States, became reciprocally enemies to each other, and that the inhabitants of the Confederate States engaged iu the rebellion, or giving aid and comfort thereto, were at the same time amenable to the municipal law as rebels. The correctness of this determination is not disputed. The question is, not as to the right of the United States to adopt either course ’ against the inhabitants of the Confederate States engaged in the rebellion; that is, the right to treat-them as public enemies, and to apply to them all the harsh measures justified by the rules of war; or the right to prosecute them in the ordinary modes of criminal procedure for the punishment of treason; but what course has Congress, by its legislation, authorized. For it is evident that legislation founded upon the war powers of the government, and directed against the public enemies of the United States, is subject to different considerations and limitations from those applicable to legislation founded upon the municipal power of the government and directed against criminals. Legislation in the former case is subject to no limitations, except such as are imposed by the law of nations in the conduct of war. Legislation in the latter case is subject to all the limitations prescribed by the Constitution for the protection of the citizen against hasty and indiscriminate accusation, and which insure to him, when accused, a speedy and public trial by a jury of his peers.
The war powers of the government have no express limitation in the Constitution, and the only limitation to which their exercise is subject is the law of nations. That limitation necessarily exists. When the United States became an independent nation, they became, to use the language of Chancellor Kent, “ subject to that system of rules which reason, morality, and custom had established among the civilized nations of Europe as their public law.”* And it is in the light of that law that the war powers of the government must be considered. The power to prosecute war *316 granted by the Constitution, as is well said by counsel, is a power to prosecute war according to the law of nations, and not in violation of that law. The power to make rules concerning captures on laud and water is a power to make such rules as Congress may prescribe, subject to the condition that they are within the law of nations. There is a limit to the means of destruction which government, in the prosecution of war, may use, and there is a limit to the subjects of capture and confiscation, which government may authorize, imposed by the law of nations, and is no less binding upon Congress than if the limitation were written in the Constitution.* * The plain reason of this is, that the rules and limitations prescribed by that law were in the contemplation of the parties who framed and the people who adopted the Constitution.
Whatever any independent civilized nation may do in the prosecution of war, according to the law of nations, Congress, under the Constitution, may authorize to be done, and nothing more.
Now, in Brown v. United States,† Mr. Chief Justice Marshall, in delivering the opinion of the court, said that it was conceded that “ war gives to the sovereign full right to take the persons and confiscate the property of the enemy wherever found,” and added that “the mitigations of this rigid rule, which the humane and wise policy of modern times has introduced into practice, will more or less affect the exercise of this right, but cannot impair the right itself. That re *317 mains undiminished, and when the sovereign authority shall choose to bring it into operation the judicial department must give effect to its will.” The question presented for consideration in that case was whether enemy’s property, found on land at the commencement of hostilities with Great Britain in 1812, could be seized and condemned as a necessary consequence of the declaration of war; and the decision of the court was that it could not be condemned without an act of Congress authorizing its confiscation.' The lauguage of the eminent chief justice is perhaps subject to some qualification, if it was intended to state as a rule of public law that all property of the enemy, whether on land or water, was subject to confiscation. Mr. Wheaton, who is authority on all questions of public law, says that by the modern usage of nations, which has acquired the force of law, “private property on land is exempt from confiscation, with the exception of such as may become booty in special cases, when taken from enemies in the field or in besieged towns, and of military contributions levied upon tbe inhabitants of the hostile territory,” and that “ this exemption extends even to the case of an absolute and unqualified conquest of the enemy’s country.”* And Mr. Chief Justice Marshall, in the subsequent case of The United States v. Pereheman,† observed that it was unusual, even in cases of conquest, for the conqueror to do more than to displace the sovereign and assume dominion over the country, and that “ the modern usage of nations, which has become law, would be violated; that sense of justice and right, which is acknowledged and felt by the whole civilized world, would be outraged if private property should be generally confiscated, and private rights annulled.”
But assuming the severe rule laid down by the chief justice to be the true rule, it applies only to the property of enemies; and by enemies is meant permanent inhabitants of the enemy’s country. It is their property alone which is the subject of seizure and confiscation by authority of Congress, legislating under the war powers. Their property is *318 liable, not by reason of any hostile disposition manifested by them or hostile acts committed, or any violations of the laws of the United States, but solely from the fact that they are inhabitants of the hostile country, and thus in law are enemies.
If we turn now to the act of July 17th, 1862, we find that its provisions are not directed against enemies at all, but against persons who have committed certain overt acts of treason. It does not purport in any part of it to deal with enemies. It declares in its title that its object is “ to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes.” The other purposes relate principally to slaves, their employment or colonization, and the power of the President to proclaim amnesty and pardon. They have no bearing upon the questions under consideration, and need not be further noticed. The first section of the act prescribes the punishment for treason thereafter committed. It punishes it with deaths or, in the discretion of the court, with imprisonment for not less than five years and a fine of not less than ten thousand dollars; and it provides that the slaves of the party adjudged guilty, if any he have, shall be declared free. The second section provides for the punishment of the offence of inciting, setting on foot, or engaging in any rebellion or insurrection against the authority of the United States or the laws thereof, or engaging in or giving aid and comfort to the rebellion then existing. The third section declares that parties guilty of either of the offences thus described shall be forever incapable and disqualified to hold any office under the United States. The fourth section provides that, the act shall not affect the prosecution, conviction, or punishment of persons guilty of treason before the passage of the act, unless such persons are convicted under the act itself.
Then follow the clauses which provide for the seizure and confiscation of the property of certain classes of persons, who may thereafter be guilty of certain overt acts of treason. They contain no directions whatever for the seizure of the property *319 of enemies, but only of persons who may thereafter violate the provisions of the act. Among the classes designated are included persons who may thereafter hold any agency under the Confederate States or under any State composing the Confederacy, and persons owning property in any loyal State or Territory of the United States or District of Columbia, who shall thereafter assist and give aid and comfort to the rebellion; persons who may or may not be enemies in the sense in which the term is used in the law of nations; that is, permanent inhabitants of the enemy’s country. So through all the provisions of the act, there is not a single clause which indicates, in the slightest degree, that it was against public enemies its provisions were directed. They arc applicable to all persons who may do certain acts, whether they be enemies or not within the meaning of the law of nations.
The only place in the act where the word enemies is used, is in the clause which provides that if it be found by the courts, before which proceedings are instituted, that the property seized belonged to a person engaged in the rebellion or who had given aid or comfort thereto, it should be condemned as enemies’ property; that is, should be condemned in the same manner as if it were enemies’ property. This clause does not provide that the property shall be condemned if found to be enemies’ property, but that when condemned it shall be with the like effect as though it were such property.
It would seem clear, therefore, that the provisions of the act were not passed in the exercise of the war powers of the government, but in the exercise of the municipal power of the government to legislate for the punishment of offences against the United States. It is the property of persons guilty of certain acts, wherever they may reside, in loyal or disloyal States, which the statute directs to be seized and confiscated. It is also for acts committed after the passage of the statute, except in one particular, corrected by the joint resolution of the two houses, that the forfeiture is to be declared. If it had been the intention of the statute to confis *320 cate the property of enemies, its prospective character would have been entirely unnecessary, for whenever public war exists the right to order the confiscation of enemies’ property, according to Mr. Chief Justice Marshall, exists with Congress.
That the legislation in question was directed, not against enemies, but against persons who might be guilty of certain designated public offences, and that the forfeiture ordered was intended as a punishment for the offences, is made further evident by what followed the passage of the act of Congress. After the bill was sent to the President it was ascertained that he was. of opinion that it was unconstitutiorfal in some of its features, and that he intended to veto it. His objections were that the restriction of the Constitution concerning forfeitures not extending beyond the life of the offender had been disregarded. To meet this objection, which had been communicated to members of the House of Representatives, where the bill originated, a joint resolution explanatory of the act was passed by the House and sent to the Senate. That body, being informed of the objections of the President, concurred in the joint resolution. It was then Bent to the President and was .received by him before the expiration of the ten days allowed him for the consideration of the original bill., He returned the bill and resolution together to the House, where they originated, with a message, in which he stated that, considering the act and the resolution, explanatory of the act, as being substantially one, he had approved and signed both. That joint resolution declares that the provisions of the third clause of the fifth section of the act shall be so construed as not to apply to any act or acts done prior to its passage, “ nor shall any punishment or proceedings under said act be so construed as to work a forfeiture of the real estate of the offender beyond his natural life.”
The terms here used, “forfeiture” of the estate of the “ offender,” have no application to the confiscation of enemies’ property under the law of nations. They are, as justly observed by counsel, strictly and exclusively applicable to pun *321 ishment for crime. It was to meet the constitutional requirement that the punishment by forfeiture should not extend beyond the life of the offender that the joint resolution was passed. The President said to Congress, the act is penal, and does not conform to the requirement of the Constitution in the extent of punishment which it authorizes, and I cannot, therefore, sigh it. Congress accepts his interpretation, and by its joint resolution directs a construction of the act in accordance with his views. And this construction, thus directed, is decisive, as it appears to me, of the character of the act.* Indeed it is difficult to conceive of any reason for the limitation of the forfeiture of an estate to the life of the owner, if such forfeiture was intended to apply only to the property of public enemies.
The inquiry, then, arises, whether proceedings in rem for the confiscation of the property of parties charged to be guilty of certain overt acts of treason, can be maintained without their, previous conviction for the alleged offences. Such proceedings, according to Mr. Chief Justice Marshall, may be had for the condemnation of enemies’ property when authorized by Congress. The proceedings in such cases are merely to authenticate the fact upon which, under the law of nations; the confiscation follows. But here the inquiry is, whether, upon the assumption that a party is guilty of a particular public offence, his property may be seized, and upon proof of his guilt, or its assumption, upon his failure to appear upon publication of citation, condemnation may be decreed. The inquiry is prompted from the supposed analogy of these cases to proceedings in rem for the confiscation of property for offences against the revenue laws, or the laws for .the suppression of the slave trade. But in these cases, and in all cases where proceedings in rem are authorized for a disregard of some municipal or public law, the offence constituting the ground of condemnation inheres, as it were, in the thing itself. The thing is the instrument *322 of wrong, and is forfeited by reason of the unlawful use made of it, or the unlawful condition in which it is placed. And generally the thing, thus subject to seizure, itself furnishes the evidence for its own condemnation. Thus, goods found smuggled, not having been subjected to the inspection of the officers of the customs, or paid the duties levied by law, prove of themselves nearly all that is desired to establish the right of the government to demand their confiscation. A ship entering the mouth of a blockaded port furnishes by its position evidence of its intention to break the blockade, and the decree of condemnation follows. A ship captured whilst engaged in the slave-trade furnishes, in the use to which it was subjected, the material fact to be established for its forfeiture. In all these cases the proceeding is against the offending thing. And it is true that in these cases criminal proceedings wall also lie against the smuggler, or slave-trader, if arrested, and that the proceedings in rem are wholly independent of, aud unaffected by, the criminal proceedings against the person. But in the two cases the proof is entirely different. In the one case, there must be proof that the thing proceeded against was subjected to some unlawful use, or was found in some unlawful condition. In the other case the personal guilt of the party must be established, and when condemnation is founded upon such guilt, it must be preceded by due conviction of the offender, according to the forms prescribed by the Constitution. “ Confiscations of property,” says Mr. Justice Sprague in the Amy Warwick,* “ not for ai'137 use that has been made of it, which go not against an offending thing, but are inflicted for the personal delinquency of the owner, are punitive, and punishment should be inflicted only upon due conviction of personal guilt.”
If we examine the cases found in the reports, where proceedings in rem have been sustained, we shall find the distinction here stated constantly observed. Indeed, were this not so, and proceedings in rem, for the confiscation of prop *323 erty could be sustained, without any reference to the uses to which the property is applied, or the condition in which it is found, but whilst, so to speak, it is innocent and passive, and removed at a distance from the owner and the sphere of his action, on the ground of the personal guilt of the owner, all the safeguards provided by the Constitution for the protection of the citizen against punishment, without previous trial and conviction, and after being confronted by the witnesses against him, would be broken down and swept away.
There is no difference in the relation between the owner and his property and the government, when the owner is guilty of treason and when he is guilty of any other public offence. The same reason which would- sustain the authority of the government to confiscate the property of a traitor would justify the confiscation of his property when guilty of any other offence. And it would sound strange to modern ears to hear that proceedings in rem. to confiscate the property of the burglar, the highwayman, or the murderer were authorized, not. as a consequence of their conviction upon regular criminal proceedings, but without such conviction, upon ex parte proof of their guilt, or upon the assumption of their guilt from their failure to appear to a citation, published in the vicinage of the property, or posted upon the doors of the adjoining court-house, and which they may never have seen. It seems to me that the reasoning, which upholds the proceedings in this case, works a complete revolution in our criminal jurisprudence, and establishes the doctrine that proceedings for the punishment of crime against the person of the offender may be disregarded, and proceedings for such punishment be taken against his property alone, or that proceedings may be taken at the same time both against the person and the property, and thus a double punishment for the same offence be inflicted.
For these reasons I am of opinion that the legislation, upon which it is sought to uphold the judgment in this case, is not warranted by the Constitution.
I proceed to consider whether, if that legislation be valid *324 and constitutional, the proceedings in the case are in conformity with its requirements.
The act of Congress requires the seizure of the property, the forfeiture of which is sought, to be-made under directions of the President. This seizure is. preliminary to the commencement of proceedings for the condemnation of the property. “After the same shall have been seized,” says .the statute, such proceedings shall be instituted. This preliminary executive seizure is essential to authorize the filing of a libel of information, and in that sense it is essential to give the court'jurisdiction to proceed; but it does not of itself vest in the court jurisdiction over the property. The President could discharge the property from the seizure without the permission of the court or invoking its action. The mere fact that the marshal is employed as the agent in making the seizure does, not alter the case. He does not then act as an officer of the court under its process. Any other person might be selected by the President as his agent. In cases under the revenue- laws the seizure is often made by the collector or some officer other than the marshal, and the same thing might be done here. The preliminary seizure, if the property be movable, only determines the court in which judicial proceedings shall be instituted. To give the court control over the property something more is essential. The property must be brought into the custody of the court; and this can only be done under the process of the court. The very theory upon which all proceedings in rem are sustained is that, jurisdiction of the court is acquired by taking the res into its custody. It is the seizure under judicial process, judicial seizure as distinguished from any preliminary seizure in any other way, which gives the jurisdiction, and nothing else ever has been held to confer jurisdiction in this class of eases.
Now in the case before us there was not in my judgment any preliminary seizure of the property made by order of the Executive or through his officers or agents, or any subsequent seizure under judicial process. The proceeding was instituted for the forfeiture of 200 shares of the common *325 stock of the Michigan Southern and Northern Indiana Railroad Company, and 343 shares of the Detroit, Monroe, and Toledo Railroad Company, and the only pretence of seizure consisted in a notice given by the marshal, previous to the suit, to the vice-president of the first company and the president of the second company that he had seized the stock in question. The marshal retui’ned that he made the alleged seizure by giving notice in this way. Neither the president of one company ór the vice-president of the other company were in possession of the stock, nor were they the agents of the owner, nor was any possession ever taken of the .property by the marshal, unless such notice had the power of transmitting the possession to him. To constitute a valid seizure of property as a basis for a proceeding in rein, the party previously in possession must be dispossessed and unable any longer to exercise dominion over the property, and such dominion must be transferred to the officer making the seizure. No other seizure than this will sustain proceedings inrem, according to the established doctrine in admiralty and revenue cases, unless a different mode of seizure is specially prescribed by statute. No other mode would conserve the principle of notice to the party whose property was to be affected, which is essential to the validity of all judicial proceedings. “ It is a principle of natural justice of universal obligation,” says Chief Justice Marshall, “ that before the rights of an individual be bound by judicial sentence,' he shall have notice, either actual or implied, of the proceedings against him. Where these proceedings are against the person notice is served personally or by publication ; where they are in rcm, notice is served upon the thing itself. This is necessary notice to all those who have any interest in the thing and is reasonable because it is necessaiy and because it is the part of common prudence for all those who have any interest in it to guard that interest by persons who are in a situation to protect it.”*
The doctrine that notice to the owner is given by seizure *326 of the thing, rests upon the presumption that the owners of property retain possession of it themselves, or place it in the care and management of persous who will represent them and communicate to them any proceedings taken against their interest in relation to it. In this case this doctrine is entirely disregarded. The notice given to the president of one company and the vice-president of the other might,, with equal propriety, have been given to any other strangers to the owner. How the marshal could get possession of a thing which he did not touch nor handle nor control, by giving notice to two individuals in Detroit, themselves having no control or possession of the property, passes my comprehension. Shares or stock in companies can only be seized in virtue of statutory provisions, which prescribe a mode of seizure equivalent to actual taking of possession. No such provisions existed in the law of Michigan, in which State the proceedings were had. The Attorney-General, in .his instructions to the district attorney for carrying out the act, directed that stocks should be seized according to the methods prescribed by the State law. As no such methods were prescribed by the law of Michigan, or especially prescribed by the court, the case was one for which no provision was made.
After the libel was filed there was no new attempt to make any other seizure óf the property than the one previously made. The process of the court directed the marshal to hold the stock which he had seized, referring, evidently, to the preliminary seizure. The marshal returned that he had seized and held the property, referring, as I understand it, to such preliminary seizure.
But further, the act of Congress declares that the proceedings for the condemnation of the property seized shall .conform, as nearly as may be, to proceedings in admiralty or revenue cases. Here the proceedings are against property on land, and they must, therefore, conform, as nearly as possible, to proceedings in revenue eases. Now, the act of 1799 prescribes the proceedings in revenue cases, and provides that after default “ the court- shall proceed to hear *327 aud determine the cause according to law.”* And, in the ease of The United States v. The Schooner Lion,† Mr. Justice Sprague, whose great learning justly adds weight to his opinions, gave a construction tó this clause. A default had been properly entered, and it was contended by the district attorney that condemnation followed’of necessity, upon default, without a hearing, but the learned judge, citing the clause mentioned, said: “ This makes it imperative that there shall be some hearing before a decree of forfeiture, but to what extent must depend upon the circumstances of the case. The court will at least examine the allegations of the libel to see if they are sufficient in law, and the return of the marshal and such affidavit'or affidavits as the district attorney shall submit. Where it appears that the owners have had full notice of the proceedings, and ample opportunity to intervene, and have voluntarily declined to do so, slight additional evidence will be sufficient. Indeed, a wilful omission by the owners to auswer and thereby make disclosure as to material facts within their knowledge, might, of itself, satisfy the court that a forfeiture should be decreed. But the court will require the prosecutor to introduce full proof of the allegations in the lil>el whenever the circumstances shall make it reasonable.” It will hardly be pretended that the circumstances in this case did not render it reasonable that such full proof should be had, and yet no such proof was had. The only proof offered was of a doubtful admission-of the claimant, and consisted of the ex parte deposition of a single witness to a conversation which he alleged he had had with the claimant in 1863 in Virginia.
But this is not all. The act of Congress of 1862 further provides, in prescribing the proceedings to be taken, that “ if ” the property seized “ shall be found to have belonged to a person engaged in’ rebellion, or who has given aid or comfort thereto, the same shall be condemned.” Evidently some’ finding of the court is here contemplated upon presentation of proofs, aud it appears to me, was intended as *328 authority for the subsequent decree, as much so as the verdict of a jury is authority for the subsequent judgment, and that without such finding the decree cannot stand. The record discloses that no such finding was made, and that no decree even was entered, as required by the 29th Admiralty Rule, that the libel be taken pro eovfesso, so as to justify the assumption that its allegations were true.
As the act is highly penal in its nature, it would seem that, according to well-received rules, it should be strictly construed, and a rigid compliance with its provisions exacted. But the very opposite course in the construction of the act appears to have been adopted by the majority of the court.
I am of opinion that the judgment of the court below should be reversed.

 1 Kent’s Commentaries, 1.

 Thus it is forbidden by the law of nations to use poisoned weapons, or to poison wells, springs, waters, or any kind of food intended for the enemy. “ Any state or general,” says Halleek, “who should resort to such means would be regarded as an enemy to the human race, and excluded from civilized society.” So also it is forbidden to encourage the assassination of an enemy or his generals or leaders, or to put to death prisoners of war, except in case of absolute necessity, or to make slaves of them or to sell them into slavery; or to take the lives of the aged, disabled, and infirm, or to maltreat their persons. The United States are not freed from these prohibitions because they are not inserted in the Constitution. — (Halleck’s International Law, chaps. 10 and 18.)

 8 Cranch, 122.

 Law of Nations, Lawrence’s ed., p. 596.

 7 Peters, 86.

 See Bigelow v. Forrest, 9 Wallace, 350; and McVeigh v. United States, supra, 258.

 2 Sprague, 150.

 The Mary, 9 Cranch, 144.

 1 Stat. at Large, p. 695, § 89.

 1 Sprague, 400.