Brooklyn Borough Gas Company, Plaintiff, *v.* John J. Bennett, Jr., Attorney-General of the State of New York; Morris S. Tremaine, Comptroller of the State of New York; Mark Graves, Commissioner of Taxation and Finance of the State of New York; Milo R. Maltbie and Others, Constituting the Public Service Commission of the State of New York, and The Public Service Commission of the State of New York, Defendants.

Supreme Court, Albany County, January 9, 1935.

*Shearman & Sterling* [*William L. Ransom, Jacob H. Goetz, Edwin D. Kyle, Jr.,* and *Henry S. Reeder* of counsel], for the plaintiffs Consolidated Gas Company of New York, The New York Edison Company, and their affiliated gas and electric companies.

*Henry R. Frost* and *Elmer B. Sanford* [*William L. Ransom, Edward J. Crummey, Jacob H. Goetz* and *Edwin D. Kyle, Jr.,* of counsel], for the plaintiff Long Island Lighting Company and its affiliated gas and electric companies

*Whitman, Ransom, Coulson & Goetz* [*William L. Ransom, Jacob H. Goetz, Edwin D. Kyle, Jr.,* and *Henry S. Reeder* of counsel], for the plaintiffs Brooklyn Borough Gas Company and the New York and Richmond Gas Company.

*LeBoeuf, Winston, Machold & Lamb* [*Horace R. Lamb* of counsel], for the plaintiffs Buffalo General Electric Company, etc., and others.

*Whitman, Day & Nier* [*Carroll N. Whitman* of counsel], for the plaintiff Rochester Gas and Electric Corporation.

*Cullen & Dykman* [*Jackson A. Dykman* of counsel] for the plaintiff The Brooklyn Union Gas Company.

*John J. Bennett, Jr., Attorney-General* [*Henry Epstein, Solicitor General,* of counsel], for the defendants.

SCHENCK, J.   The above-entitled actions, nine in all, are brought to obtain a declaration of rights and for injunctions to restrain the enforcement of chapters 284 and 643 of the Laws of 1934.   The Attorney-General, as defendant, and likewise as attorney for the

other defendants in each of such actions, brings these motions to dismiss each of the complaints herein on the ground that they do not state facts sufficient to constitute a cause of action. Procedural questions have been eliminated by the parties and will not be considered upon these motions, no question as to the form and availability of the actions, the form and propriety of the motions or the jurisdiction of the court having been raised by any of the parties.

Chapters 284 and 643 added sections 13-a and 13-b to the Transportation Corporations Law in respect to consumers' deposits and read as follows:

" § 13-a. Report of deposits. In the month of July in each year and on or before the tenth day thereof, every gas corporation, electric corporation and/or gas and electric corporation shall make a verified written report to the public service commission, which report shall contain a true and accurate statement of all consumer deposits made with the public utility and all interest accrued thereon, which on the first day of June preceding such report had remained unclaimed by any person or persons authorized to receive the same for ten years then next preceding. Such statement shall set forth the date of each such deposit, its amount and the name and last known place of residence of the person making it. In case any such public utility shall at said date have held no such unclaimed deposits it shall at the time above specified make a verified written report to the public service commission so stating. No deposit shall be deemed unclaimed within the meaning of this section if it appears from the books of the public utility or from other written evidence on file with said public utility that the person or persons authorized to receive them have knowledge thereof.

" All consumer deposits which on the first day of June preceding such report had remained unclaimed by any person or persons authorized to receive the same for fifteen years then next preceding shall within thirty days after such report is filed with the public service commission be paid, together with all accumulated interest thereon, into the treasury of the state of New York.

" § 13-b. Refund of deposits to owners. Upon receipt of the consumer deposits hereinbefore referred to in section thirteen-a, and notwithstanding any inconsistent provision thereof, the commissioner of taxation and finance shall pay three-fourths of the amount of said deposits into the general fund and shall pay the remaining one-fourth of the amount of said deposits into a special fund of the treasury of the state and properly designate and maintain the same. Upon presentation of satisfactory proof of ownership of a consumer deposit to the commissioner of taxation and finance and when so certified to the comptroller of the state,

the comptroller shall draw a warrant or voucher upon such special fund for the amount of such consumer deposit so received by the commissioner of taxation and finance, payable to the person or persons who shall have established their right to receive the same."

The deposits referred to in the two sections above quoted were made pursuant to section 13 of the Transportation Corporations Law and prior statutes. Section 13 as it now exists reads as follows:

" § 13. Deposit of money may be required. A gas corporation, an electric corporation or a gas and electric corporation may require every person to whom such corporation shall supply gas or electricity for any building, room or premises to deposit with such corporation a reasonable sum of money according to the estimated quantity of gas and electricity necessary to supply the same for two calendar months, to secure payment for gas or electricity.consumed, or for rent of pipe, wire or fixtures, but every corporation shall allow to every such depositor legal interest on the sum deposited so long as it shall remain with the corporation, payable on return of the deposit. Whenever such deposit has been held by a gas or electric corporation for a period of two years, the interest on such deposit, beginning with the interest to October first, nineteen hundred thirty-three, shall be credited on the next bill for gas or electric service rendered the depositor after October first, nineteen hundred thirty-three, and such a credit shall be allowed at the expiration of each succeeding two-year period."

This provision or a substantially similar provision has been a part of the statutory law of this State since 1859. Chapter 311 of the Laws of 1859 was an act to provide for the inspection and sealing of gas meters, and for the protection of consumers of illuminating gas, and contained this provision:

" § 7. That every such gas light company may require that all, each and every person or persons to whom such company shall supply, or shall be requested to supply gas for lighting any building, room or premises, deposit with such company a reasonable sum of money, according to the number and size of lights used or required, or proposed to be used for two calendar months, by such persons or person, and the quantity of gas necessary to supply the same, as security for the payment of the gas rent, or compensation for gas consumed, or rent of meter, pipe and fixtures, to become due to the company, provided, however, that every such gas light company shall allow and pay to every such depositor legal interest on the sum by him deposited, for and during the time his deposit shall remain with the company."

Subsequently, the statute was amplified by amendments to include electric corporations and gas and electric corporations, all of which are now contained in the present section 13 of the Transportation Corporations Law. The Public Service Commission from time to time since its organization has made various orders, rules and regulations in connection with deposits made under the present and earlier statutes.

From the papers before the court on these motions, it would appear that these deposits aggregate very large sums of money, one complaint setting forth that the deposits of the plaintiff corporations therein as of June 1, 1934, amounted to upwards of $2,000,000, and it is estimated that several million dollars will be turned over to the State if sections 13-a and 13-b are complied with.

At the time these deposits were made, receipts were issued to the consumers making such deposit, of which the following is a typical example:

" ROCHESTER GAS AND ELECTRIC CORPORATION

" No. ——                                                $ ——

" *This receipt is not negotiable nor transferable*

" ROCHESTER, NEW YORK,        19—.

" Received of        The Sum of        Dollars on Deposit.

" It is hereby expressly agreed between the Rochester Gas and Electric Corporation and the said depositor that this deposit shall be subject to the deduction of any indebtedness due from        to said Company. Upon full payment of any such indebtedness and return of this certificate, the said Rochester Gas and Electric Corporation agrees to refund said deposit with interest at six per cent per annum and further agrees to pay interest annually upon demand. Payment for each calendar year ending December 31st, to be made on or after the next succeeding February 1st, upon such demand.

" Interest will be discontinued when depositor ceases to be a consumer.

" ROCHESTER GAS AND ELECTRIC CORP.

" By

" Preserve this receipt to be surrendered when deposit is returned."

It is the claim of the plaintiffs that sections 13-a and 13-b are unconstitutional in that they deprive the plaintiffs of their property without due process of law; that plaintiffs are likewise deprived of equal protection of the law and that said sections impair the obligations of the contracts heretofore made between the plaintiffs

and their consumers. The plaintiffs also claim that if said sections were designed to be revenue measures they are discriminatory and in any event impose unreasonable burdens upon the plaintiffs.

The defendants, the representatives of the State, on the other hand, contend that the moneys paid over to the plaintiffs by their consumers were merely deposits of sums of money; that in these deposits the plaintiffs had a potential interest which never ripened into actual ownership by reason of the fact that the conditions authorizing the plaintiffs to require these deposits to be made never arose; that the only title which these plaintiffs have to the funds in question is that of mere custodian. The defendants, as representatives of the State, also claim that in so far as the plaintiffs are concerned these deposits have served the purpose as security; that since these deposits were made pursuant to the direction of the Legislature of the State under its authority to regulate public utilities, the State should see to it that the funds are conserved and that the owners thereof should be secured by the pledge of the faith and credit of the State for their return, and finally, if any part of these deposits is to be ultimately abandoned, the public from which they were collected should receive the benefit thereof rather than the utility which has enjoyed their use to the full extent for the purpose for which they were deposited.

Many of the questions urged in this case have been passed upon in connection with analogous statutes and at the outset it should be determined what questions remain open for discussion. In *Provident Institution for Savings* v. *Malone* (221 U. S. 660) it appears that in 1907 there was enacted in the Commonwealth of Massachusetts a statute known as chapter 340 of the Massachusetts statutes of 1907, which provided:

" Sec. 56. The probate court shall, upon the application of the attorney-general and after public notice, order and decree that all amounts of money heretofore or hereafter deposited with any savings bank or trust company to the credit of depositors who have not made a deposit on said account or withdrawn any part thereof or the interest, or on whose passbooks the interest has not been added, which shall have remained unclaimed for more than thirty years after the date of such last deposit, withdrawal of any part of principal or interest, or adding of interest on the passbook, and for which no claimant is known or the depositor of it cannot be found, shall, with the increase and proceeds thereof, be paid to the treasurer and receiver general, to be held and used by him according to law, subject to be repaid to the person having and establishing a lawful right thereto, with

interest at the rate of three per cent per annum from the time when it was paid to said. treasurer to the time when it is paid over by him to such person.

"Sec. 57. Any person claiming a right to money deposited with the treasurer and receiver general under the provisions of the preceding section * * * may establish the same by a petition to the superior court."

Pursuant to the provisions of that statute, the Attorney-General of Massachusetts in May, 1908, filed a petition in the Probate Court and upon this petition the Provident Institution for Savings was ordered to pay over to the Treasurer and Receiver General of the Commonwealth the deposits set forth in such petition. The savings institution contended that the statute in question deprived persons of their property without due process of law and impaired the obligations of the contracts between it and its customers. On appeal the order directing the savings institution to turn over the deposits to the Treasurer and Receiver General was affirmed by the Supreme Judicial Court (*Attorney General* v. *Provident Institution for Savings*, 201 Mass. 23; 86 N. E. 912.) The Supreme Judicial Court considered the principal argument of the savings institution against the constitutionality of the statute, which was set forth in the opinion as follows:

" ' One. The Legislature cannot substitute another person for the person with whom the depositor made his original contract.

" ' Two. The Legislature cannot substitute a right to the whole of a small fund for a proportional share of a deposit in a very large one.

" ' Three. The Legislature cannot turn a *cestui que trust* of the savings bank into a mere creditor of the State.

" ' Four. The Legislature cannot impair the depositor's right to interest.

" ' Five. The Legislature cannot deprive the respondent of the right to retain the deposits until called for by the owners.

" ' Six. The Legislature cannot deprive a bank of its right to do business in accordance with the terms of its charter.' "

The court held that the contract between the depositor and the savings institution was not made to continue for all time where the depositor died or abandoned his property altogether. It held to the contrary that the charter granted to the savings institution and the contract between it and the depositor were made subject to the sovereign power of the Commonwealth, through proper proceedings to take possession of property that escheated to the Commonwealth, and also to take into its care and custody the property abandoned by its owner when he was absent from

the Commonwealth leaving no one to represent him. The court further held that the contract between the corporation and the depositor included an implied condition that the Commonwealth might care for the property in the circumstances, that the Commonwealth had a substantive right to take the property into its charge and to hold it as trustee for the owner until he established his rights.

The procedure outlined in the statute was also discussed at length by the court. It held in the first place that the fact that the last act of the depositor must have occurred more than thirty years prior to any proceedings under the statute indicated at least *prima facie* that there was no owner in charge or care of the property and seemingly that it had been abandoned. This furnished a strong presumption that willingly or unwillingly or ignorantly, the owner had permanently abandoned it, and this gave the State jurisdiction to take it in charge. Although it was to be held and used by the Treasurer and Receiver General of the State, nevertheless the rights of the owner were recognized and he was entitled to repayment when he established his lawful right thereto. In other words, the property was held for the owner in trust and ample security was given for the performance of the trust. The court held further that as to the requirement of the statute that public notice be given, that matter could be left to the court to apply the statute properly under the rules of law.

The case went to the United States Supreme Court (*Provident Institution for Savings* v. *Malone, supra*). The court pointed out that if the statute had provided that the money should be paid over to the Treasurer and Receiver General if the owner after a short absence could not be found or if the account remained inactive for a brief period, a very different question would be presented from that arising under an act which deals with absence and non-action so long continued as to suggest that the law of escheats or of lost property might be enforced, and that the act was like those which provide for the appointment of custodians for the real and personal property of an absentee. Mr. Justice LAMAR, delivering the opinion of the court, says: " In this case though the money is on deposit with a bank, which has faithfully kept its contract, yet the statute proceeds on the general principle that corporations may become involved, or may be dissolved; or that, after long lapses of time, changes may occur which would require some one to look after the rights of the depositor. The statute deals with accounts of an absent owner, who has so long failed to exercise any act of ownership as to raise the presumption that he has abandoned his property. And if abandoned, it should be

preserved until he or his representatives appear to claim it; or, failing that, until it should be escheated to the State. The right and power so to legislate is undoubted."

The court also held that the statute was reasonable in its terms and so framed as to work injustice to no one; that the fact that the rate of interest to be paid by the State was different than that to be paid by the savings institution was a matter between the State and the depositor when the depositor asserted his right to the property and that there was nothing unequal or discriminatory in making the act applicable only to abandoned deposits in savings banks. Such classification was reasonable.

The jurisdiction of a State over property within its borders under circumstances indicating an abandonment by the owners thereof has been repeatedly sustained. Many cases may be cited requiring banks to pay over to the State savings deposits which have long remained unclaimed and it has been held that statutes of that character are not unconstitutionally discriminatory against savings banks simply because they are made applicable only to them. (*Security Savings Bank* v. *California*, 263 U. S. 282; *State* v. *Savings Union Bank & Trust Co.*, 186 Cal. 294; 199 P. 26; *State* v. *First National Bank of Portland*, 61 Ore. 551; 123 P. 712; *Germantown Trust Co.* v. *Powell*, 265 Penn. St. 71; 108 A. 441; *Columbia National Bank* v. *Powell*, 265 Penn. St. 85; 108 A. 445; *Greenough* v. *Peoples Savings Bank*, 38 R. I. 100; 94 A. 706.)

Certain of the provisions of the statute in the instant case differ from the Massachusetts statute heretofore discussed and the California statute considered in *Security Savings Bank* v. *California* and it will be necessary to determine whether or not these differences are so material as to affect the constitutionality of the New York statute. The length of time elapsing before the transfer of deposits to the State in the Massachusetts statute is thirty years, and under the New York statute relating to utility deposits, fifteen years. The difference in lapse of time is not unreasonable by reason of the difference in the nature of the deposits. In the case of a savings bank, deposits are ordinarily made to remain for a long period of time. For example, deposits are often made for children in their early years which are designed not to be withdrawn until possibly the child arrives at its majority and often these accounts become inactive and are permitted to accumulate. When we consider deposits of this nature, and there are many of them, thirty years might well be a period of time that would properly be designated in connection with savings bank deposits generally.

When we deal with a deposit to secure a gas or an electric bill, the situation is entirely different. After service is discontinued there is no reason for leaving the deposit, and it would appear that a period of fifteen years after such deposit has served its purpose is such a length of time that such deposits may be considered as having been abandoned.

It is further claimed by the plaintiffs in these actions that the statute is so vague and ambiguous with respect to the reports of these deposits as to leave serious doubt as to its real meaning. Section 13-a requires a report to be made to the Public Service Commission containing a statement of all consumer deposits remaining unclaimed for a period of ten years next preceding the report. For the purpose of eliminating any possible case where the deposit might still secure the account of a consumer, the statute provides that no deposit shall remain unclaimed if it appears from the books of the utility or from other written evidence on file with it that the person or persons authorized to receive it have knowledge thereof. In *Security Savings Bank* v. *California* (*supra*) the provision as to unclaimed savings bank deposits was to the effect that no one claiming the deposit within twenty years had filed any notice with the bank showing his present residence and that the president and managing officer of the bank did not know that the depositor was alive. It would appear that the rule under the New York statute is even more liberal. Any written evidence indicating knowledge by the owner of the deposit on file with the utility will prevent the deposit from being deemed to be unclaimed. Such written evidence may be reports of the authorized officers and agents of the utility itself as well as claims or other evidence furnished by the owners of the deposits. The utility is fully protected. (See 4 St. Dept. Rep. 1 as to the records required to be kept by the utility.) The New York statute in question differs from that considered in *Security Savings Bank* v. *California* (*supra*), in that the California statute permitted confiscation of deposits by the State by the process of escheats after a period of years. This in effect involved all rights of ownership and interest in and to said property.

Also in *Provident Institution for Savings* v. *Malone* (*supra*) it appeared that the deposits under the Massachusetts statute were held in custody by the State with interest payable at three per cent irrespective of the rate of interest agreed to be paid to the original depositor, which, in fact, was four per cent. Section 13 of the Transportation Corporations Law of this State requires the utility to allow interest so long as the deposit shall remain with the corporation, payable on return of the deposit, which requirement has

been in the statutes since 1859. Section 13-a requires that the deposit and interest be paid into the treasury of the State, and section 13-b requires a portion of these deposits to be made available for return to depositors, but there is no provision for allowance or payment of interest. Can it be said that this means confiscation so far as the depositor is concerned? The New York statute is in principle the same as the Massachusetts statute considered in *Provident Institution for Savings* v. *Malone* (*supra*). In that case the interest was reduced; in the case at bar no interest at all is allowed. If the New York statute amounts to confiscation, the Massachusetts statute was likewise confiscatory, the difference being simply a matter of degree.

In respect to the matter of interest, the Supreme Court in *Provident Institution for Savings* v. *Malone* (*supra*) said at (p. 665): " It is true that the rate of interest paid by the State is not the same as that paid by the bank — as to sums under $1,600 it is less, and as to those over $1,600 it is more. But this is a matter with which the plaintiff in error is not concerned and can arise only between the State and the claimant when he asserts a right to property long neglected and apparently abandoned.

" But the bank insists that there has been no abandonment; that the money is in safe hands where it was originally left, under by-laws which contemplated that the deposit might remain in the bank without interest on sums over $1,600 until the corporation was dissolved. It contends that to deprive it of the benefit of such deposits is to take property without due process of law.

" But while there was a possibility that the money might so remain the bank had no right to require that it should be so left. Neither the charter nor the by-laws create anything in the nature of a tontine, under which, on dissolution of the corporation, the then depositors would receive the money of those absent and unknown. On dissolution, the shares of a depositor who could not be found would be paid over to his legal representative, who might be an administrator in case his death was established, or a guardian, in case of mental incapacity, or a trustee in bankruptcy in case of insolvency, or a representative appointed under statutes applicable to abandoned property. But it is not necessary to wait for the dissolution of the bank. If the facts warrant it, a legal representative can be appointed at any time, with all the rights incident to such appointment, including that of withdrawing the funds and holding them for the true owner when he shall establish his claim."

In so far as the utility is concerned, it has no cause for complaint for the reason that the deposit and the accumulated interest does not and cannot belong to it, nor does it seem that the depositors can

complain. It was pointed out by the Public Service Commission, in 4 State Department Reports, 1, that these deposits generally amount to approximately seven dollars in each instance and that the deposits shall remain with the utility for two or three years. It was never contemplated that these deposits should remain with the utility forever and that interest should be continually credited without limit in point of time. To hold that an implied contract existed between the utility and the depositor which under the statute contemplated a deposit upon which interest should be paid without limit as to time, is to read into the contract something never contemplated by the depositor. The rule is clearly stated by the Supreme Judicial Court of Massachusetts in *Attorney General* v. *Provident Institution for Savings (supra)*, where it says (at p. 26): " The contract between the corporation and each depositor, by an implied condition, was to be subject to termination by the Commonwealth whenever conditions should arise that would justify the State in exercising this power to take the property into its care for the benefit of the persons entitled to it, and when the Commonwealth, in view of these conditions, should assert this power. There is nothing in the respondent's charter that limits the right of the Commonwealth in these particulars. By the act of the Legislature the corporation was authorized to receive deposits of money, and to use and improve them to the best advantage for the persons making the deposits. St. 1816, c. 92. The ownership of property by the depositors, and the right of the Commonwealth to deal with property within its jurisdiction, are not affected by the statute."

The original contract was made in contemplation of the exercise by the State of its police power after a lapse of time indicating an abandonment, to take over the property for its preservation. The statute here in question is reasonable in its terms. It preserves the deposit and interest accrued for the benefit of the owner. Whether or not the State shall continue to credit interest, and if so, at what rate, is a matter of policy to be determined by the State. The fact that no interest is allowed in the circumstances does not render the statute unconstitutional, nor does it amount to confiscation inasmuch as the original contract was not made in contemplation that the payment of interest would never cease.

Another material difference between the statutes relating to the payment to the State of savings bank deposits and the statutes here before the court is with respect to notice of the proceedings leading up to the actual transfer of the funds to the State. In the case of savings bank deposits under the Massachusetts statute and under similar statutes of other States, it appears that notice is

required to be given the depositors in the first instance. Such notice is generally by publication and is deemed reasonable where the subject is abandoned property after a considerable length of time. The question of publication is the serious question in this case. Were the plaintiffs and the depositors accorded due process of law, which includes notice and the right to a hearing? Section 13-a of the Transportation Corporations Law requires a verified written report to the Public Service Commission in the month of July in each year, which report shall contain a list of deposits unclaimed for ten years next preceding the first day of June. All deposits remaining unclaimed for fifteen years next preceding June first prior to the report are required within thirty days after such report is filed to be paid to the Treasurer of the State. No such deposit is to be considered unclaimed within the meaning of the section if it appears that the utility has notice that the person or persons authorized to receive the deposits have knowledge thereof. The rights of the owners of such deposits are sought to be safeguarded by the provision in section 13-b that upon presentation of satisfactory proof of ownership of a deposit to the Commissioner of Taxation and Finance, the same shall be paid over to the person establishing his right to the same. In so far as the utility is concerned, none of these deposits can be taken from its possession without due notice and an opportunity for it to be heard. As a matter of fact, the proceedings are initiated by the utility itself by the filing of the report with the Commission. In so far as a hearing is concerned, the utility itself is the arbiter as to what particular deposits are to be reported, so that the necessity of a formal hearing does not arise. If the report of the utility is unsatisfactory to the State, there is ample provision in the Public Service Commission Law to compel compliance with the statute and in this connection the orders of the Commission can be reviewed by the court, so that in all these respects due process is secured. (Public Service Commission Law, §§ 11–22 and 66; *Matter of N. Y. C. R. R. Co.* v. *Public Service Commission*, 238 N. Y. 132.) There must also be due process in so far as the depositor is concerned, for if the law is not valid as to such depositor it will furnish no protection to the utility when it parts with the deposit. (*Louisville & Nashville R. R. Co.* v. *Deer*, 200 U. S. 176; *Security Savings Bank* v. *California, supra.*)

Proceedings like these may be considered as *in rem* or *quasi in rem* and the filing of the report whereby the utility is constrained to turn over the deposits is the equivalent of seizure of a debt; in fact, this is followed by actual seizure. (*Security Savings Bank* v. *California, supra.*)

It has been said that where proceedings are strictly *in rem*, seizure is constructive notice to the whole world. (*Hollingsworth* v. *Barbour*, 4 Pet. 466, 475.) It has been explained that this is too broad a statement and while seizure itself is notice to the owner, who is presumed to know whatever has become of his own property, as to others than the owner having rights in the property, advertisement is required to constitute due notice. (*Proceedings in Rem,* Waples, pp. 88–90.)

It would appear that the doctrine that seizure is notice solely to the owner and publication to others, is contrary to the accepted notions on this subject. Seizure for some purposes is notice to the whole world, including the owner, in those proceedings where, by experience, this form of notice has been found to be reasonable and necessary. (*The Mary*, 9 Cranch, 126; *Nations* v. *Johnson*, 24 How. 195; *Hollingsworth* v. *Barbour, supra.*)

As a general rule, seizure standing alone is not due process. This is indicated by the traditional practices in proceedings *in rem.*

Proceedings by attachment or garnishment are proceedings *in rem* where a thing is seized and the owner is not personally summoned and does not appear. These proceedings had their origin in the ancient process of foreign attachment under powers possessed by suitors in the Mayor's and Sheriff's Court of the City of London. The object of the proceeding was to enable the creditor to attach the money or goods of his debtor in the hands of a third person and deprive the owner of all control over the same until he appears to answer the claim or until the debt is satisfied. (Locke on Foreign Attachment, 1.) The procedure resembles somewhat that of the Instance Court, in Admiralty, which was based on the civil law. According to the custom plaintiff entered his complaint and filed an affidavit of debt, that affidavit being the foundation of the process. Immediately thereafter a notice of attachment was served upon the garnishee. The ancient practice was for process then to issue summoning the defendant. The officer charged with the duty of serving the process made a return to the court " that the defendant had nothing within the liberty of the city by which or whereby he could be summoned, nor could he be found within the said liberty." Thereupon proclamation was made, the defendant was solemnly called at the court and made default. This occurred upon four separate occasions. Upon these returns the plaintiff made an allegation of debt owing to the defendant by a third person, whereupon summons was served upon the garnishee. As a matter of fact, no effort was made to summon the defendant, although the record of proceedings in the Mayor's Court contained a note of the effort to summon and the return, but this was a mere fiction and

the custom did not require any notice actually to be given to the defendant. (Locke on Foreign Attachment, 1–14.) It may be noted that the seizure was supplemented by proclamation and delay. The fiction indicated that seizure was not alone sufficient to justify an attachment.

In Admiralty, under the English system, the proceedings did not rest upon the mere seizure of the *res*. Thus, in the Prize Court, where the court was notified of the seizing and bringing into port of a prize, notice by monition was affixed to one of the pillars of the Royal Exchange, whereby all persons interested were monished and cited to appear. (History of the English Prize Court, Roscoe, 37.) In the Instance Court the ship was arrested on warrant which was executed by producing the original before the master and crew and affixing a copy to the mast of the ship. The warrant contained a citation to the master of the ship and all others in general having any interest therein to appear and answer and defend. No person formally appearing, the court proceeded for defaults. Proclamation was made, the persons cited were thrice publicly called in court and this was repeated on four successive court days. Thereafter, plaintiff was put into possession upon giving security. After the lapse of a year, the defendant not appearing to defend, possession became absolute in the claimant. (2 Civil and Admiralty Law [1st Am. ed.], Browne, 397–404.)

Such practices indicate that seizure standing alone has never been regarded as due process, under the procedure of civil law as administered in England at the time we inherited it. In the Admiralty Court in prize cases, seizure was supplemented by publication; in the Instance Court seizure was supplemented by proclamation and a year's delay; in attachment and garnishment in the Sheriff's and Mayor's Court of London, seizure was followed by proclamation and delay. In proceedings *in rem* in Admiralty in the United States, seizure is supplemented by publication of notice. (1 Benedict on Admiralty [5th ed.], 367.)

Similar practice has been followed in other classes of proceedings *in rem* which follow the Admiralty procedure. For example, condemnation under the Pure Food Act. (*443 Cans of Frozen Egg Product* v. *United States*, 226 U. S. 172; *Union Insurance Co.* v. *United States*, 6 Wall. 759.)

Though notice by publication as well as seizure is necessary *in rem* to make a sentence in such proceeding binding on the whole world, such sentence is one which usually affects ownership by transferring or extinguishing rights or interest in or to the thing subject to the jurisdiction. Where, however, title or ownership is unaffected and custody only is involved, a different situation is

presented. It is one thing to have jurisdiction to take the custody of property and another to have jurisdiction to hear and determine a sentence. Seizure before publication justifies taking the custody of the *res* and preserving it, but notice by some other method must supplement seizure before sentence or condemnation.

Under the statute now before the court, the utility has notice since it initiates the proceedings resulting in the transfer of the deposits and by reason of the fact that it prepares and files the notice which is the basis of the transfer. It is not denied a hearing, being itself the arbiter in the beginning and it may thereafter have recourse to the courts. The owners of the deposits have notice by the seizure. It is simply a change of custody and not a confiscation, as the deposit may be reclaimed at any time. It being merely a change in custody and no condemnation or confiscation, the rights of the owners or of third parties who may have some interest in or claim upon the fund are in no wise affected. Therein the case at bar differs from *Security Savings Bank* v. *California* (*supra*). In that case the necessity of notice by publication as well as seizure was suggested. There, however, the savings bank deposits were confiscated by the State after a limited time and the proceedings were designed to divest title of the owner.

Several other matters have been argued on these motions, including the applicability of the Statute of Limitations. Clearly the Statute of Limitations has not run against these deposits. (Civ. Prac. Act, § 15.) The statute under which these moneys were turned over to the utility designates the moneys as " deposits " and the consumers, as " depositors." Moneys so deposited do not become due until demand is actually made and the statute begins to run at the time of such demand. No time limitation is contained in the statute and no demand for the return of the deposit has been made. It has been pointed out by the plaintiffs here that this court held in *Matter of Furey* v. *Graves* (148 Misc. 785; affd., 241 App. Div. 897), recently affirmed by the Court of Appeals,* that where a right of action depends upon some act to be performed by a party preliminary to commencing suit and he is under no restraint or disability, he cannot suspend indefinitely the running of the Statute of Limitations by delaying the performance of the preliminary act, as this would put it within the power of a party to defeat the very purpose of the statute. The rule there laid down is not applicable here. Section 13 of the Transportation Corporations Law provides for a deposit of money which is not repayable at any specific time. The statute made the consumer a depositor and the money turned over to the utility for which the depositor received a receipt was given the character of a deposit.

---

* 266 N. Y. 415.

Section 15 of the Civil Practice Act (Subd. 2) provides that where there is a deposit of money not to be repaid at a fixed time but only upon a special demand, the time must be computed from the demand. In *Matter of Furey* v. *Graves* it was pointed out that the payment of transfer taxes was not a deposit within the provisions of section 15 of the Civil Practice Act, but that the purpose of the delivery of the money there to the State contemplated a payment discharging the lien of the tax and for the purpose of stopping the running of interest and penalties. But again, it was pointed out in that case that the basic idea of the deposit of money is safe-keeping, whether the identical money or its equivalent is to be returned to the depositor.

The deposit made to the utility was a continuing security not payable at any fixed time as in *Corkings* v. *State* (99 N. Y. 491). As the consumer moved from one place to another or discontinued the use of gas or electricity for a time, the deposit might remain to secure future service. Since no demand has been made by the depositor nor the money repaid by the utility upon the termination of the service, the State now seeks to substitute itself as custodian in the place and stead of the utility. The Statute of Limitations by any reasonable construction cannot be available as a defense to such substitution.

Plaintiffs contend further that since but one-fourth of the funds turned over to the State are specifically set aside to repay depositors, the balance is, in effect, confiscated. It is pointed out that once seventy-five per cent of these deposits becomes part of the general fund, such moneys will not be available for any purpose except in pursuance of an appropriation. (N. Y. Const. art. 3, § 21.) The constitutional limitations as to appropriations in general do not here apply. (*People ex rel. Evans* v. *Chapin*, 101 N. Y. 682.) Furthermore, the fund consisting of one-fourth of the deposit is augmented from year to year as deposits are paid by the utility. The 1934 statute in effect pledges the State to return the deposit and a fund is set up for that purpose, which by all reasonable expectations should be sufficient to make repayments. While no provision is made for the replenishment of the special fund, it must be assumed that the Legislature will properly carry out the intent of the statute. If, however, the time should arrive when the special fund is exhausted and not renewed, the Comptroller will then be justified in refusing to consider a claim. (State Finance Law, § 4, subds. 5, 36 and 58; Transportation Corporations Law, § 13-b; *O' Neil* v. *State*, 223 N. Y. 40.) But even under such circumstances the owner of the deposit may go to the Court of Claims. (*O' Neil* v. *State, supra; Quayle* v. *State*, 192 N. Y. 47; *Burnham* v. *Bennett*, 141 Misc. 514; affd., 235 App. Div. 751.)

Clearly the court has jurisdiction. The Court of Claims is open to claimants in cases of contracts where the Comptroller may not audit. (*O' Neil* v. *State, supra; Quayle* v. *State, supra.*) Here there is an express agreement on the part of the State to take over and maintain these deposits and refund them to the owners upon proper proof of ownership. The agreement is based upon sufficient consideration. (*Siegel* v. *Spear & Co.*, 234 N. Y. 479.)

For the reasons heretofore stated, I find the statutes in question constitutional. The motions before me are to dismiss the complaints on the grounds that they do not state facts sufficient to constitute a cause of action. These complaints are framed to secure among other things a declaration of rights and for that purpose they may be sufficient. Since, however, the real purpose of these actions is to determine the validity of the statutes in question, declaratory relief may be waived and the actions stand upon the demand for an injunction. These matters may be settled by counsel on the settlement of the order.