Marshall,
 
 Gh. J.
 

 delivered the opinion of the Court as follows:
 

 Nanning J. Visscher, an American citizen, administrator of general Garret Fb-lier, deceased» went to Great Britain in the year 1811, for the purpose of collecting the estate of the said general Garret Fisher in that country, and remitting it to the United States for those who were entitled to it by lawn Immediately after the repeal of the orders in council, the said Nanning J. Vissclier invested a considerable portion of the funds of the said estate in British merchandize, and engaged the brig Mary, a vessel having an American register, to convey it to the United States. The Mary was engaged at Woolw ich and came round to Bristol, where her cargo was procured. She began to take it on board on the 3d of August, 1812$ and.on the 15th of August, having completed her lading, she sailed from the port of Bristol for the United States, having on hoard a British license dated on the 8th of July, ±812. While-prosecuting her voyage she encountered such severe weather, and received such damage, as to be under the necessity, in order to avoid the danger of foundering at sea, to put into the port of Waterford, in Ireland, for the purpose of being repaired.. While lying in Water,
 
 *140
 
 ford and undergoing repairs, she was also detained by a general embargo, imposed on all American vessels in the ports of Great Britain. The Mary, being released by the high Court of admiralty, and her repairs being completed, her license was renewed on the 27th of March, 1815, and she sailed from Waterford, for Newport, in Rhode Islam], on the 7th of the following month. On the 22d day of April she was captured by the American privateer Paul Jones-, captain Taylor, and brought into Newport, Rhode Island, where the vessel and cargo were libelled as enemy property. No claim being put in for the vessel, she was
 
 condemned;
 
 but the cargo. which wa i claimed by.N.anning J. Yisscher, for himself and the" other heirs of general Fisher, was restored. From this sentence the captors appealed. In the Circuit Court the sentence of thp District Court was reversed and the cargo was condemned. From this sentence of condemnation an appeal was taken to this Court, arid the case was argued at the last term.
 

 The president’s instructions of the 28th of .August, 1812, were tiien for the first time relied on, but it was not admitted on the part of the captors, that these instructions vi'ere known to captain Taylor. For the ascertainment of this important fact, it was necessary to admit further proof;
 

 It being uncertain how this fact would appear, the. Court also directed further proof on other points which were involved in some degree of doubt.
 

 It is now proved inoontestibly that the instructions of the. 28th of August were on board the Paul Jones at the time of the capture. These additional instructions direct “ the public and private armed vessels of the United
 
 “
 
 States not to intercept any vessels belonging to citi-
 
 “
 
 zens of the United States, coming from British ports
 
 “
 
 to the United States, laden with British merchandize,
 
 “
 
 in consequence, of the alleged repeal of the British or- « ders in council.”
 

 The effect and operation of these instructions were settled in the case of the
 
 Thomas Gibbons.
 
 The only enquiry to be made in this case is, do they apply to the Mary ?
 

 
 *141
 
 To sustain their application it must appear,
 

 4. That the Mary belonged, at the time of. capture, to a citizen of the United States.
 

 . 3. That she was coming ft om a British port to the United States; laden with'British merchandize, in consequence of the alleged repeal of the British orders in council.
 

 4. Was the Mary the property of an American citizen r
 

 She carried an American register, which represented her as the property of James B.- Kennedy, a citizen of the United States'. .
 

 She sailed from Charleston, in South Carolina, as an American vessel, commanded by captain Stafford, a native. American citizen, who continued to cbmmand. her until her capture, and who always supposed her tó be the property of Mr. Kennedy. H.er first license, which was granted before intelligence of the declaration of war had reached'England, was granted to her as al* American vessel; and m the .renewed license, she was; still considered as an American vessel.»
 

 In opposition of this testimony is th'e deposition of one of the mariners, who supposes one Smith,,a British subject, to be a part owner of the, Mary, because the captain so informed him, and .because Smith ordered the people about as much as Mr. Kennedy or the captain.
 

 So much of this deposition as refers to me information of the captain, is not very probable 5 and if true, must either discredit the captain’s testimony, orbe.considered as a. communication made for some particular purpose while the vessel was in a British -port. That part of it which states Smith to have ordered the people about as much as Mr. Kennedy, is not very intelligible, since Mr. Kennedy, the,owner of the Mary, does not appear to have been on hoard the vessel, or at Bristol, or at Waterford.
 

 
 *142
 
 Had a claim been put in for the Mary, this tesHmony, opposed to the proof furnished by the register and the deposition of the captain, would have been light indeed.
 

 But no claim was filed for the Mary, and she was consequently, according to the course of the Court of admiralty, condemned as enemy property.
 

 This sentence is now relied on by the captors as establishing the fact. The argument has been' pressed with great earnestness, and is certainly entitled to serious consideration.
 

 Tlie conclusive ciFct which the captors would give to this sentence is founded in part on reasoning which is technical, and in part on the operation which the fact itself ought'to have oil the human mind in producing a conviction, that,the claim was not filed because it could not be sustained.
 

 A sentence of
 
 p
 
 Court of admiralty is. said not only to hind the subject -matter on which it is pronounced, but to prove conclusively the facts which it asscrio. This principle has been maintained in tlie Courts of England, particularly as applying to cascs-of insurance, -and has been adopted by this Court in the case of
 
 Croudson and others v. Leonard.
 
 Its application'to the ease at bar will be considered.
 

 The Mary was not condemned by the sentence of a foreign Court of admiralty in a case prior to and distinct from that in which the cargo was- libelled. Site Was comprehended in the same libel with the cargo.
 

 The whole subject formed but one cause, and the-whole came on together before the same judge. By the rules of -the Court the condemnation of tlie vessel was inevitable j not because'in fact she was British property, but because the fact was charged and was not repelled by the owner, he having failed to appear and to put in his claim. The judge could not close his,eyes on this circumstance; nor could he, in common justice, subject the cargo, which was claimed according to the pourse of the Court, to the liabilities incurred by being
 
 *143
 
 imported in a hostile1 bottom. In tlie same cause, a fact, not controverted by one party, who does not appear, and therefore as to him taken for confessed,, ought not, on that implied admission,* to be brought to bear upon another who
 
 does
 
 appear, does controvert, and does prove it. The owners of the cargo had no control over the owner of the vessel. Yisscher could not force Kennedy to file a claim
 
 ■,
 
 nor could Yisscher file a claim lor him.
 

 The evidence that the vessel was American property could not he looked into so far as respected the rights of Kennedy, because he was in contumacy ; but Yisscher was not in contumacy. He was not culpable for, and therefore ought not to suffer for, the contumacy of Kennedy. That contumacy, in reason and injustice, ought not to have prevented the District Court from looking, into .the testimony concerning proprietary interest in the vessel, so far as the rights of other Claimants depended on that interest. Not* is the Court informe,d of a legal principle which shquhl have restrained the district judge from looking into this testimony. If we reason from analogy, we find no principle adopted by the Courts of law or equity, width in its application to Courts of admiralty, would seem to subject one. Claimant to injury from the contumacy of another.
 

 A judgment against one Defendant for the want of a plea, or a decree against one Defendant for want of an answer, does not prevent. any, other Defendant fr >m contesting, so far as respects himself, tlie véry fact which is admitted by the absent party.
 

 No reasSn is perceived why a different rule should prevail in a Court of admiralty, nor is the Court informed of any case in which a different rule has been established.
 

 If the Ristricf Court was not precluded by the non-claim of the owner of the vessel from examining the fact of ownership, so far as that fact could affect the cargo, it will not be contended that an Appellate Court may not likewise examine it.
 

 This case is to be distinguished from .those which
 
 *144
 
 have been decided on policies of insurance, not only by the circumstance that the cause respecting the vessel and the cargo came on at the same time before the same Court, but by other differences in reason and . in law, which appear to be essential.
 

 The decisions of a Court of exclusive jurisdiction áre necessarily conclusive on ali other Cruets, because the subject matter is hot examinable in them. With respect to itself no-.rteasOri is perceived for yielding to them a further conclusiveness than is allowed to the judgments and decrees of Courts of common law and equity. They bind the subject matter as between parties and privies.
 

 ..The whole world, it is said, are parties in. an admi,ralty causej and, Ibcrcf-¡re, the whole world is bound by the decision. The reason on which, this
 
 dictum
 
 stands will determine its extent, Every person may .make himself a party, and appeal from the
 
 sentence;
 
 but notice of the controversy is necessary in order to become a p^irty, and it is a principle of natural justice, of universal obligation, that before the rights of an individual be bound by a judioial sentenc.e, .he shall have notice, either actual or implied, of the proceedings against liinp Where these proceedings are against the person, notice is served personally, or by publication$ where they are
 
 in rcm,
 
 notice is served .upon the thing itself,. Tliis is.necessarily notice to all those who have any interest iri $be thing, and is reasonable because it is necessary, aird because it is the part of common prudence for all those who have any interest in it, to guard that interest by. persons win) are in, a situation to protect it. Every person, therefore, who could*assert any title to'the. Mary, has constructive notice of her seizure, and may "'fairly be considered as a party to'the libel. But those who have no interest in the vessel which cotild b.e asserted in the .Court of admiralty, have no notice of her seizure, and can, on no principle of justice or reason, be considered as parties in the cause so far as respects the vessel. . When such person is brought before a Court in which tlic tact is examinable, no sufficient reason is perceived for precluding him from reexamining it. The judgment of a Court of common lawy dr the decree of a Court of equity; would; under such.
 
 *145
 
 circumstances, be re-exaiftinable in a Court of common law, or a Court of equity } and. no reason is discerned ■why the sentence of a Court of admiralty^ under the same circumstances, should not be re-examinable in a Court of admiralty.
 

 . This reasoning is not at variance with the decision that the sentence of a, foreign Court of admiralty, condemning a vessel or cargo' as enemy property, is conclusive in an action against the underwriters on a policy in which the propérty is warranted- to be neutral.
 

 It is not at variance with that decision, because the. question of prize is one of which' Courts of law have no direct cognizance, and because the owners of the vessel and cargo were narties to the libel against them,
 

 In the case of
 
 Croudson and al. v. Leonard,
 
 two judges expressed their opinions. Those who were silent, but who concurred in the opinion of the Court, undoubtedly acquiesced in the reasons assigned by those judges. On the conclusiveness of a foreign sentence,
 
 judge Jhhnson
 
 said, « The doctrine appears to ‘me to rest on" three
 
 a
 
 very obvious considerations: the propriety of leaving «the cognizance of prize questions exclusively to «-Courts of prize jurisdiction} the very great incon- « veniencc, amounting nearly to an impossibility,_.o£ « fully investigating such cases in á Court of common «íaw} and the impropriety of revising the / decisions « of the maritime Courts of other nations, whose juris- « diction is co-ordinate, throughout the world.”
 

 These reasons undoubtedly support the opinion founded oh them} butitwillbe readily perceived that they would not apply to the case before the Court.
 

 . After státing the cbhclusivéness of the sentence of. Courts of exclusive jurisdiction, judge Washington said, « This- rule, when, applied to the sentences of Courts of « admiralty, whether foreign or domestic, produces the «doctrine which I am now considering, upon the «ground that all the world are parties in an admiralty «cause. The proceedings are
 
 in.rent;
 
 but any person « having an interest in the property may interpose, a « claim, or may prosecute an appeal from the sentenee.
 
 *146
 

 “
 
 The insured is emphatic lly a party, and. in every in- « stance has an opportunity to controvert the alleged “ grounds of condemnation, by proving, if he can, the <■ neutrality of the property.. The master is his immediate agent, and he is also bound to act for the benefit « of all concerned; so that in this respect he also, repre- “ sents the insurer.”
 

 The very foundation of this opinion that the insured is bound by the sentence of condemnation is, that he was in law a party to the suit, and had a full opportunity to assert his rights. This decision cannot be applicable to one in which the person t°' be affected by the sentence of condemnation was not, and could not be a party pit.
 

 Jf the sentence condemning the Mary did not technically preclude the owners of the cargo from asserting in the. Court of admiralty her American character, the weight of the evidence'on that point is to be fairly estimated.
 

 In support of her American character, the documentary evidence is complete and unequivocal; and the corroborative testimony is calculated to strengthen a belief in the verity of the register. In support of her hostile character the- omission of the owner to file his claim is chiefly relied on. The. importance of this circumstance is not to be controverted. Its weight, however* is mpch diminished by the consideration fjhat tlie case affords no reasonable ground, for believing that the owner could have been restrained from making his claim by the apprehension of failing to support it. There is no testimony, and there is no re s in to suspect that .any testimony was attainable which could have successfully opposed the register. This consideration gives plausibility to the argument that the worthlessness of the vessel, the bottomry bond, with which she was charged, the expectation that the eordemna bin would relieve him from that debt, might be the motives for not resisting that condemnation. It is possible, too, that in point of fact, he might not have actnal notice of the proceedings. This is not to be nr suméd, and is not to benefit the owner; but it is passible; and may be taken into the
 
 *147
 
 account m estimating the effect of this negligence on persons who are not culpable for it.
 

 It has been said that the owners of the cargo, and that Nanning J. Visscher, who held the bottomry bond, ought to have filed a claim. But the interest under the bottomry bond could not have been asserted ; noy had the owners of the cargo any right to the vessel. Had they known that they were to be, in any manner,' affected by the character of the vessel, they might, and most probably would have exerted themselves to have brought forward Kennedy as a Claimant, or to have accounted for his silence
 
 ;
 
 but in the District Court the president’s instructions were unknown, and their effect unthought- of. The owners of fee cargo, therefore, neither troubled themselves about the vessel, «rife attempted to account for thp claim to her not being! filed. When afterwards in this Court the bearing of those instructions was discovered, and further proof was directed! that direction did not extend to proof which might account for the failure of Kennedy to assert his title to the vessel. This may excuse the Claimants for not producing testimony to that point.
 

 Upon the best consideration we have been able to bestow upon the subject, the Court is of opinion that the Mary, in this claim, must be deemed to have been the property of an American citizen.
 

 2. Did she sail from a British port in consequence of the alleged repeal of the British orders in council i
 

 That the voyage in its inception was produced by the opinion that the repeal. of the British orders in council would terminate the differences between the two nations, is too clear for controversy. Had the Mary proceeded directly from Bristol to her .port of destination in the' United States, the counsel for the captors would not contend that it was not a voyage described by the instructions of the 28th of August, But the delay in the port of ^Vaterfoyd, it is said, has broken the continuity of the voyage, and in deciding-on its character,'the departure-from Waterford, not the departure from Bristol, must be considered as its commencement,
 

 
 *148
 
 It is not denied that; in a commercial sense, this Is one continued voyage, to take its date at the departure of the Mary from Bristol. • But it is urged that where the lights of war intervene, a- different construction must take place.
 

 The Court does not accede to the correctness of this distinction. '
 

 The Mary was forced into Waterford by irresistible necessity, and w’as detained there by the operation of causes she could not control. Had her deptuMure been from a neutral port, and she had been thus forced^ during the voyage, into a hostile port, would it be alleged that she had incurred the liabilities of a vessel sailing from a port of the enemy ? It is believed that this allegation could not be sustained, and that it would not be made. But as between the Captors and the captured in this case, the, voyage was, in its commencement, as innocent as if made from a friendly port. The detention at Waterford., then, can no more affect the character of the voyage in the one case than in the other,
 

 But it is said that the owners of the cargo ought to have applied to the American government for a license to bring it into the United States.
 

 So far as respects the captors, thpre could he no necessity for a license, since the vessel was already protected. from them by the orders of the president un„er which they sailed ; and for any other purpose a license was unnecessary, provided-the importation, if the voyage had been immediate and direct from Bristol, could bg justified.
 

 If a cargo be innocently put on board in an enemy Country, if at that time it be lawful to import it into the United States, the importation cannot be rendered Unlawful by a detention occasioned, in the course of the voyage, either by the perils of the sea, or the act of the enemy, unless this effect be produced by some positive act of t he legislature.
 

 There is no such act.
 

 
 *149
 
 ' It has been contended that the act for the mansion of fines, penalties and forfeitures in certain cases, passed on the 2d of January, 1813 controls the .instructions given by the president on the 28th of AugHSt, 1812, and limits thé-iperátion of those instructions to,the specific cases described by congi-ss
 
 •,
 
 arid as that act protects only t¡«os'* importations which were made previous to its passage, it has been argued that the president’s instructions can go no further.
 

 Independent of the-war, all British merchandize was .excluded from the ports of the United Spates by a systpm of policy supposed to have been founded on the Brit Ah orders in council.
 

 The secretary of-the treasury had power to remit forfeitures incurred under these laws. When the orders in council were repealed, large shipments were made of British merchandize by American merchants in the full confidence that the American restrictive system would fall with the orders which produced it. This opinion and the proceedings in consequence of it, were thought excusable both by the executive and legislative departments of government. The president-instructed the. cruizers of the United States not to molest vessels of this description, “but on the contrary, to give aid and assistance to the same; in order that such vessels
 
 “
 
 and their cargoes may be dealt with on their arrival, « as may be decided by the competent authorities.”
 

 These instructions act solely on the rights of war, and regulate, the. conduct of the public and private armed vessels of the United States.
 

 The legislature passed an act on the 2d of January 1813, taking away the discretion of the secretary of the. treasury, and directing him absolutely to remit, all penalties and forfeitures incurred by violating the nou-in tercourse iaws, in all cases of importation made before the passage of the act, in American vessels, provided the goods were the property of citizens of the United States, and the vessels departed from any port of the United Kingdom of Great Britain and Ireland between the 23d da of June and the 15th of September then, preceding.
 

 
 *150
 
 This act does not contemplate the conduct of captors, or the, rights of war. its sole object is to remit certain penalties already incurred by a violation-of municipal law1. The legislature docs not appear to have had in the instructions given by the president to the armed vessels of the United States, much less to have intended to control those instructions.
 

 But, in effecting these different objects, .the executive and the legislature were impelled by the same motive — ■ the peculiar hardship, of exposing the citizens of the Unítéd States in such a case to the penalties either of war, or of municipal law. The one intended to protect from capture, the other from forfeiture, property which had been shipped in the reasonable confidence that peace and commercial intercourse between, the. two countries were the fruits of the repeal of the British orders in council. The president recognized the principle, but left the time within which it should .operate, to be decided by the, arnu'd vessels and by the Courts, according to the circumstances .of each case. The legislature prescribed certain limits within which it should operate. This Court, in construing, the less explicit instructions of the president, with respect to the departure .of a vessel from a British port, has respected the more explicit language of the legislature on the same subject. But the instructions of the president relate oply to the departure of the vessel. They do not extend to the timp of its,arrival. In this respect there is nothing to be explained. Consequently the act of congress can furnish no aid in their construction. That the instructions were intended to protect from capture all vessels whit'li had sailed in that c< nfidence which was inspired by the repeal of the British orders in council, however the voyage might bo protracted, is apparent from their language,- and from the fact that they continued to be delivered to the armed vessels of the United States after the passage of the act of the 2d of January, 1818.
 

 It is the unanimous opinion of the . Court that the Mary was, at the time of her capture, .protected by the instructions under which the captor sailed.
 

 This opinion renders all inquiry into the character of the cargo unnei jssary,
 

 
 *151
 
 The counsel for the captors have claimed their costs and expenses, on the ground that there was probable cause of capture,
 

 This claim is sustained by the Court. Further has been required, and the latehess of. the period at which the Mary vvas found on the ocean, justified a suspicion that her case wás not one to which the instructions of the president extended.
 

 The sentence of the Circuit Court condemning the cargo of the Mary is reversed, and the cause is remanded to that Court with directions to dismiss the libel so far as respects the cargo, and to restore the same to the Claimants, and to allow the captors their reasonable ■sosts and expenses.