### In re FOOD & FIBRE PROTECTION, LTD., Debtor.

**Walter T. THOMPSON, Trustee; United Agri Products Financial Services, Inc., a Colorado corporation; and Loveland Industries, dba United Agri Products, a Colorado corporation, Plaintiffs,**

v.

**Ivan and Betty JONOVICH, husband and wife; J.S. Stephens & Sons, Inc., an Arizona corporation, Defendant.**

Bankruptcy No. 91–07580–PHX–CGC.
Adv. No. 92–761.

United States Bankruptcy Court,
D. Arizona.

May 13, 1994.

---

5. Appellee claims that her estranged husband kidnapped their daughter and fled to an undisclosed location.

J. Daniel Shell, Jennings & Haug, Phoenix, AZ, for Walter T. Thompson, Trustee.

Michael S. Green, Robbins & Green, Phoenix, AZ, for J.S. Stephens & Sons, Inc.

## OPINION AND ORDER

CHARLES G. CASE, II, Bankruptcy Judge.

### I. *INTRODUCTION*

This adversary proceeding involves the application of 11 U.S.C. § 550, regarding recovery by the bankruptcy trustee of payments made to transferees of avoided transactions. The Chapter 7 Trustee, Walter T. Thompson ("Trustee"), alleges that a transfer from the Debtor, Food & Fibre Protection, Ltd. ("Food & Fibre") to Defendant Ivan Jonovich ("Jonovich") is avoidable and that the subsequent transfer made by Jonovich to Defendant J.S. Stephens & Sons ("J.S. Stephens")

is recoverable for the estate either under Section 550(a)(1) or (a)(2) and is not insulated from recovery by Section 550(b)(1).

The case was tried to the Court on March 21, 1994. The Court holds that the payment is not recoverable from J.S. Stephens and therefore grants judgment to J.S. Stephens.

### II. *STATEMENT OF ISSUES*

1. Whether the payment from Food & Fibre to Jonovich was a preference under 11 U.S.C. § 547;

2. Whether the payment from Food & Fibre to Jonovich was voidable as a fraudulent transfer under 11 U.S.C. § 548(a)(1) or (a)(2);

3. Whether J.S. Stephens is the initial, rather than an immediate, transferee within the meaning of § 550(a)(1) and (a)(2); and

4. If an immediate transferee, whether J.S. Stephens is protected by 11 U.S.C. § 550(b)(1) as a good faith transferee.

### III. *FACTS*

#### A. Parties

Food & Fibre is an Arizona corporation which, prior to filing its petition in bankruptcy, sold at retail farming-related chemicals, including pesticides and fertilizers. Jonovich was the president, a director, and sole shareholder of Food & Fibre. United Agri Products ("UAP") was a wholesale supplier to Food & Fibre inventory, and, as a result, was and is a major creditor.

Defendant J.S. Stephens is an Arizona corporation in the business of managing farms and growing field crops. Brothers Russell G. Stephens and Jacob S. Stephens III ("the Stephens") are officers and shareholders of J.S. Stephens. The Stephens and/or J.S. Stephens have interests in a number of farming-related entities, among which are Paloma Partners and Gila Partners (collectively, "Paloma"), business partnerships which own or operate farms in western Maricopa County. Russell Stephens' wife, Sherri Stephens, was responsible for the accounts payable for Paloma, as well as for J.S. Stephens and other related entities.

### B. The "Pink Boll Worm Jackpot" of 1990

The Defendants are part of an agricultural community west of Phoenix, Arizona. In the growing season of 1990, the cotton fields in that community were infested by an unusual number of pink boll worms. The boll worms were rampant, so that the farmers had to spray three to four days a week through the growing season, or lose the crop. While the farmers typically plan for some weeks of spraying, this was a "pink boll worm jackpot," as Russell Stephens described it, so that the farmers, including Paloma, were faced with weeks of unforseen, unbudgeted, and costly spraying. In such circumstances, the standard business practice was for pesticide providers, such as the Debtor, to "ride their suppliers," such as UAP, in order to be able to carry their customers until the crop was harvested and sold. This practice worked only so far, however, so there needed to be another source of credit to make it through the crunch.

Paloma lacked sufficient cash reserves to pay for the excess pesticide until harvest. While the Stephens had access to sufficient cash, Russell Stephens believed United States government agriculture regulations to which the farms were subject would prohibit moving funds into Paloma for that purpose.[1] Not only could Paloma not pay, but Food & Fibre could not afford to carry them. Finally, Food & Fibre's suppliers, such as UAP, would not carry the excess credit needed by Food & Fibre. Jonovich, who had already poured a considerable amount of his own and his mother-in-law's money into Food & Fibre, was unable to provide a capital infusion. As further complication, Food & Fibre needed cash to preserve its ability to buy from its suppliers, such as UAP.

While its primary goal was to acquire pesticides for Paloma, J.S. Stephens had a secondary goal—to keep Food & Fibre in business. Food & Fibre products were habitually low priced. As a result, Food & Fibre had a salutary effect on the market, from the farmers' point of view, forcing competitors to keep their prices lower than they would have liked. Keeping Food & Fibre in business was, therefore, another interest J.S. Stephens and Jonovich shared.

### C. The Agreement

Paloma needed pesticides; Food & Fibre needed cash to preserve its buying position and provide Paloma with the pesticides; J.S. Stephens had cash. The obvious solution was for J.S. Stephens to supply the cash. The impediment was government regulations, which prevented J.S. Stephens from lending money to Paloma or, for that matter, to Food & Fibre. The solution Russell Stephens and Jonovich agreed upon was that J.S. Stephens would lend money to Jonovich. Jonovich, in turn, would lend money to Food & Fibre, which would allow it to acquire the pesticides need by Paloma and thereby carry Paloma through the growing season. Paloma would pay Food & Fibre after the cotton was sold. The two further agreed that, when Paloma paid Food & Fibre, Food & Fibre would pay Jonovich and Jonovich would pay J.S. Stephens.

J.S. Stephens subsequently made three loans to Jonovich for a total of $165,000.00; $40,000 on September 6; $70,000.00 on September 14; $50,000.00 on October 5. Unsecured demand notes were drawn up and executed; however, the orally agreed-upon repayment date was March 1, 1991. Jonovich put most of the money, a total of $135,000.00, into Food & Fibre, duly executing corresponding promissory notes. Jonovich used the remaining money, $30,000.00, for unrelated personal purposes.

### D. Cotton Sold; Repayment Made

Having survived the pink boll worm plague, Paloma sold its cotton. On February 12, 1991, Jonovich, for himself and Food & Fibre, and Sherri Stephens, for Paloma and J.S. Stephens, met at a local bank. In the course of 16 minutes, Paloma paid Food & Fibre for the pesticides, Food & Fibre paid

---

1. The problem was that one company, such as J.S. Stephens, could not lend money to a related company, such as Paloma, without affecting the second company's entitlements under government agriculture programs. It was Russell Ste- phens' view that the same problem would exist if J.S. Stephens had lent the money directly to the Debtor (which was the direct supplier to Paloma).

Jonovich the amount he owed J.S. Stephens [2], including principal and interest, and Jonovich paid J.S. Stephens. The transactions were accomplished by cashier's checks.

### E. Bankruptcy

In May, 1991, UAP sent a representative to go with Mr. Jonovich on his rounds to Food & Fibre customers. The representative obtained from Food & Fibre its listing of accounts receivable. Following that visit, UAP directed to itself all Food & Fibre mail. UAP also instructed all those who owed Food & Fibre money to pay UAP.[3] On June 6, 1991, Food & Fibre was locked out for non-payment of rent. On June 28, 1991, Food and Fibre filed a voluntary bankruptcy petition. In the course of the bankruptcy, Chapter 7 Trustee Walter T. Thompson [4] brought a preference action against Ivan and Betty Jonovich, Debtor Food & Fibre Protection, Ltd., and against J.S. Stephens & Sons, Inc. The Trustee alleged payment from the Debtor to Jonovich could be avoided as a preference or a fraudulent conveyance and that the payment from Jonovich to J.S. Stephens was recoverable under Section 550 of the Code.

The Jonoviches did not answer the complaint and a default judgment was entered against them on December 4, 1992. The Jonovich's then filed personal bankruptcy. This left J.S. Stephens as the only viable defendant to the Trustee's complaint.

### IV. DISCUSSION

#### A. Was the Transfer from Food & Fibre to Jonovich a Preference Avoidable under Section 547(b)?

■ The Trustee's power to recover preferences derives from 11 U.S.C. § 547(b).

The Trustee bears the burden of proving all the elements of a preference. 11 U.S.C. § 547(g); *In re Bullion Reserve of North America*, 836 F.2d 1214, 1217 (9th Cir.1988), *cert. den.* 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988). The Court finds the transfer from Food & Fibre to Jonovich is avoidable as a preference by virtue of Jonovich's status as an insider, the Debtor's insolvency, and the satisfaction of other requirements of Section 547(b).

#### 1. Effect of Default by Jonovich on J.S. Stephens

■ The Trustee argues that the default judgment avoiding the transfer as to Jonovich binds J.S. Stephens as well. The Trustee argues that, therefore, he need not prove that the transfer from Food & Fibre to Jonovich was a preference, but need only show that J.S. Stephens is a transferee against whom recovery is appropriate under Section 550. Under his theory, the Trustee is not required to prove any other fact, or carry any other burden of proof, on either the preference or fraudulent conveyance counts of the complaint. The Trustee emphasizes the separation of the concepts of avoidance and recovery which was introduced in the Bankruptcy Reform Act of 1978 [5] and asserts that, with the default judgment, the transfer from the Debtor to Jonovich was "avoided" thereby shifting the focus to Section 550 [6].

■ The Trustee is unable to provide any direct authority for this proposition, which, on its face, appears to contradict due process. The Ninth Circuit authority cited, *Lippi v.*

2. The Trustee notes that the amount repaid to Jonovich by Food & Fibre was in excess of the $135,000 lent to Food & Fibre by Jonovich. Without doubt, the amount repaid was calculated to be equal to the amount owed by Jonovich to J.S. Stephens. However, as noted below, this fact alone does not make the transfer avoidable.

3. There was no evidence that these acts of United Agri Products were either improper or contrary to its rights as a secured creditor of the Debtor.

4. In addition, original Plaintiffs included Loveland Industries, dba United Agri Products, and United Agri Products Financial Services, Inc.,

which the Court (Jones, J.), ruled lacked standing to bring this action; however, the Court allowed United Agri Products Financial Services to provide and pay for counsel for the Trustee.

5. The avoidance powers are found in Sections 544, 545, 546, 547, 548, 549, 553(b) and 724(a) of the Code. Section 550 provides a uniform set of rules for the recoverability of any of these avoided transactions, including the parties from whom such recovery may be had.

6. Section 550 is entitled "Liability of transferee of avoided transfer," thereby emphasizing its separateness from the avoidance statutes.

*City Bank,* 955 F.2d 599 (9th Cir.1992) is inapposite since the avoidance judgment resulted from a full trial, not a default.[7] In this case, J.S. Stephens *has* answered and defended, with no control over the failure of Jonovich to do so.

The application of the Trustee's rule could lead to anomalous and unfair results. Suppose, for example, the following: A trustee sues a non-insider initial transferee and also its immediate transferee to recover a preference. The initial non-insider defendant defaults, thereby "avoiding" the transaction. Under this Trustee's theory, the immediate transferee is now bound, regardless of the facts. Assume, however, that the hypothetical transfer took place on the ninety-first day prior to the bankruptcy, requiring, as a matter of law, the court to dismiss the complaint. If the trustee were able to rely conclusively upon the default and also establish the unavailability of the "good faith" defense of Section 550(b)(1) for the immediate transferee, the result would be a judgment against the immediate transferee that would require the immediate transferee to pay money for a transfer that was clearly not avoidable. That risk, of being deprived of all lawful defenses though the default of another, is presented to J.S. Stephens in this case if the Trustee's theory were to be adopted.

■ The court rejects this theory as unsupported by Rule 55, Fed.Rules of Civ. Proc., Rule 7055, Rules of Bkrtcy.Proc., or other applicable law.[8] Since Jonovich's default did not involve J.S. Stephens[9], the Trustee must establish that it is proper to avoid the transfer from the Debtor to Jonovich, then establish that J.S. Stephens, as the subsequent recipient of the money the Debtor paid Jonovich, is a "transferee" from whom payment may be recovered under Section 550(a), subsections (1) or (2).

## 2. Application of Bankruptcy Code Section 547 to Jonovich

The Court finds the Trustee has proven all the elements of a preference with respect to the transfer from the Debtor to Jonovich, as follows:

### a. *There was a Transfer.*

■ The check from the Debtor to Jonovich was a transfer as defined in Section 101(54) of the Bankruptcy Code, which encompasses every mode of parting with property or an interest in property.

### b. *The Transfer was to or for the Benefit of an Insider Creditor within One Year of the Bankruptcy.*

■ The check was payable to and negotiated by Jonovich, a creditor as defined in Section 101(10) of the Bankruptcy Code and an insider as defined in Section 101(31). The payment was made outside 90 days but within a year of the bankruptcy.

---

7. Stronger authority for the Trustee's position exists in *In re Bullion Reserve of North America,* 922 F.2d 544 (9th Cir.1991). There, the initial transferee, Saxon, stipulated as part of an overall settlement with the Trustee that the transfer from the debtor to him was avoidable as a fraudulent conveyance. The Trustee then brought a Section 550 suit against two subsequent transferees, presumably relying upon the avoidance of the transaction resulting from the stipulation. Although the Court of Appeals decision does not specifically say, it is reasonable to assume that the settlement was approved by the bankruptcy court after notice and a hearing. Rule Bkrptcy.Proc. 2002(a)(3). This process would afford the subsequent transferees adequate due process to contest the reasonableness of the parties' stipulation and indeed the opinion makes clear that all parties agreed that the transfer was avoidable. Stephens has had no such opportunity here and has not so agreed.

8. The point appears sufficiently obscure that J.S. Stephens' primary authority is an 1815 maritime case from the United States Supreme Court. *The Mary,* 13 U.S. 126, 9 Cranch 126, 3 L.Ed. 678 (1815), wherein the Court stated: "A judgment against one Defendant for the want of a plea, or a decree against one Defendant for want of an answer, does not prevent any other defendant from contesting, so far as respects himself, the very fact which is admitted by the absent party." 13 U.S. at 143.

9. Another way to look at this question is to apply the concepts of Rule 60, Fed.Rules of Civ.Proc., stating that a party must be able to demonstrate a "meritorious defense" to justify relief from a default judgment. In this case, Stephens has met this standard. *Cf. In re Roxford Foods, Inc.,* 12 F.3d 875 (9th Cir.1993).

c. *The Transfer was for or on Account of an Antecedent Debt.*

The transfer was made for or on account of an antecedent debt[10] owed by Debtor Food & Fibre before the transfer was made. The antecedent debt was the loans made from Jonovich to Food & Fibre in October, 1990 as well as additional loans which Jonovich testified he had made. Although there was no documentary evidence of such loans, Jonovich's testimony on this point is credible in light of the nature of his business, its thin capitalization, and its constant need for cash.

d. *Jonovich Received More than he would have in a Chapter 7.*

The evidence introduced at trial showed that Jonovich, an unsecured insider creditor of this virtually assetless company, received from Food & Fibre more than he would have in the hypothetical Chapter 7 liquidation.

e. *The Transfer Involved an Interest of the Debtor in Property.*

The concept of property of the estate under Bankruptcy Code section 541(a) is expansive. *Begier v. I.R.S.*, 496 U.S. 53, 58–59, 110 S.Ct. 2258, 2262–63, 110 L.Ed.2d 46, 56–57 (1990). It is undisputed that the money Food & Fibre paid Jonovich was property of the estate.

f. *The Transfer was made when the Debtor was Insolvent.*

Insolvency is the only element necessary to the finding of preference that J.S. Stephens seriously contests. The presumption of 11 U.S.C. § 547(g), that the debtor was insolvent during the 90 days immediately preceding the date of the filing of the bankruptcy petition, is of no help to the Trustee here, where the transfer occurred outside the 90–day window. The burden therefore remains on the Trustee to establish the Debtor's insolvency on the date the transfer was made. *In re Camp Rockhill, Inc.*, 12 B.R. 829, 833 (Bankr.E.D.Pa.1981).

Insolvency in a preference setting is determined by a balance sheet test, comparing the fair value of the Debtor's assets at the time of the transaction with the Debtor's liabilities of the same date. 11 U.S.C. § 101(32)(A); *Rockhill*, 12 B.R. at 833, 834. The Debtor was, as established at trial, a thinly-capitalized, closely-held corporation throughout its years of existence, financing its operation through trade credit, including credit with UAP, and through personal loans from Jonovich's mother-in-law and from Jonovich. The compiled balance sheets showed that Food & Fibre's primary assets were accounts receivable. The Trustee established, through the testimony by Robert Duskin, C.P.A., and Jonovich, that the fair value of those receivables was far below their face value. While J.S. Stephens argues that this knowledge is "20–20 hindsight," the fact is that any reasonable valuation of the receivables would lower their value drastically below the amount listed in the aging report admitted into evidence.

On the other hand, the financial statements introduced into evidence are not persuasive to prove solvency; they were not prepared according to generally accepted accounting principles, no independent investigation of the collectability of the receivables was made by the accountant, nor was any required of him by Food & Fibre. No independently tested reserve for doubtful accounts was established. The accounts of G & SA Farms, those accounts controlled by Lyle King, and accounts of G.O. Farms, appear to have a value at or near zero as of the time of the transfer.

Jonovich testified that there were various undisclosed notes receivable, some secured by real property, which were not listed on the Duskin financial statements. No further evidence of these claimed assets was produced and the Court therefore finds that there is not credible evidence of any such undisclosed assets. In any event, Jonovich also testified that there were undisclosed liabilities, particularly, loans from him to the corporation in amounts greater than the $165,000.00 lent from the proceeds of the J.S. Stephens loan to him. Taken as a whole,

**10.** "Debt" is a liability on a "claim," 11 U.S.C. § 101(12), which in turn is defined at 11 U.S.C. 101(5) to include a right to payment or right to

an equitable remedy for breach of performance if such breach gives rise to a right to payment.

therefore, the Court finds that the Trustee has carried his burden to prove by a preponderance of the evidence that the Debtor was insolvent at the time of the transfers in question here. Therefore, the transfer from Food & Fibre to Jonovich will be avoided as preference to an insider.

## B. Fraudulent Transfer

### 1. Is the Transfer avoidable under Section 548(a)(1)?

The Trustee argues that the transfer from Food & Fibre to Jonovich was a fraudulent conveyance under both the subjective standard of Section 548(a)(1) and the objective standard of Section 548(a)(2). As to the first, the Trustee claims that the transfer was made with the actual intent to hinder, delay or defraud creditors. As to the second, the Trustee also argues that the transfer is avoidable because the debtor received less than reasonably equivalent value in exchange for the payment to Jonovich, and the debtor was insolvent or rendered insolvent because of the transfer[11].

Although Section 548(a)(1) sets out a subjective test, the cases reflect the reality that actual intent is usually proven inferentially from the circumstances surrounding the transaction, with a focus on the so-called "badges of fraud". See, e.g., In re Woodfield, 978 F.2d 516, 518 (9th Cir.1992).[12] Actual intent may be proven by the Trustee by a preponderance of the evidence. See Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); Western Wire Works, Inc. Lawler (In re Lawler), 141 B.R. 425, 428 (9th Cir. BAP 1992) ("A fair reading of the Supreme Court's opinion leads to the inference that the preponderance standard in all bankruptcy proceedings grounded in allegations of fraud.") When the evidence shows the existence of some or all of the "badges of fraud," this strongly suggests, absent some

other convincing explanation, that a transaction's purpose is to defraud creditors.

The Trustee cannot make a "badges of fraud" showing in this case since most of those elements are missing.[13] Nevertheless, the Trustee argues that the transaction involved was a highly orchestrated scheme designed to divert a valuable asset away from UAP. However, the evidence does not suggest that the arrangement among J.S. Stephens, Paloma, Food & Fibre and Jonovich was devised with an intent to hinder, delay or defraud any other creditors, particularly UAP. The Trustee argues that the use of cashier's checks and the payment of all obligations on the same day was a way to funnel the value of the receivable from Paloma to J.S. Stephens rather than to other creditors. That analysis assumes that, absent the agreement with J.S. Stephens, there would have been value in the Paloma receivable which could, then, have been used to pay other creditors. That premise is incorrect.

The Paloma receivable was a link in the chain of events beginning with the loan from J.S. Stephens to Jonovich. J.S. Stephens established through credible testimony that its primary purpose in lending money to Jonovich was to get pesticides to Paloma's farms. In addition, it was in the best interests of several Stephens entities for Jonovich to remain in the market, as his pricing practices beneficially affected the regional pesticide market. The "pink boll worm jackpot" caused high demand and resulting shortages of pesticide. J.S. Stephens would never have lent the money to Jonovich had Russell Stephens not believed that Food & Fibre would continue in business, with the three-fold result that it would supply Paloma with pesticides in the immediate future, that it would be able to supply the funds to Jonovich to repay J.S. Stephens and that it would contin-

---

11. As noted above, the Trustee has proven insolvency.

12. This approach to fraudulent conveyance law finds its roots in the Statute of Elizabeth of 1571. See Damsky v. Zavatt, 289 F.2d 46, 54 (E.D.N.Y. 1961); See also G. Glenn, Fraudulent Conveyances and Preferences, §§ 58–62 (rev. ed. 1940).

13. Of the six "badges" listed in the Woodfield case, only one, insolvency, is undeniably present

and only one other, a close relationship between the parties, is arguably present, although the business relationship between Jonovich and Stephens does not fit the traditional mold for this badge. See, e.g., Eyler v. Commissioner of Internal Revenue, 760 F.2d 1129 (11th Cir.1985) (Husband and wife between whom funds were transferred had family relationship, so that badge was present).

ue to exert salutary effects on pesticide pricing for the longer term. Similarly, on the other end, Paloma earmarked the money it paid Food & Fibre for payment to Jonovich and then to J.S. Stephens.

Russell and Jake Stephens understood that it would make no business sense for Paloma to pay Food & Fibre unless that money were used to repay J.S. Stephens. Food & Fibre was solvent, if at all, only momentarily, and only because Paloma made its payment as part of the total agreement. The Paloma receivable would not have been created, but for the loan from J.S. Stephens and the related repayment arrangement. The Trustee ignores this part of the equation.

The Court does not share the Trustee's incredulity that a legitimate loan would be made without security only if there were fraudulent collusion. In the context of the entire transaction, which includes a close-knit community of interdependent business, in which credit is frequently extended, and parties who had known one another and done business together for many years, the Court will not assume the loan is fraudulent because unsecured. The Court similarly does not share the Trustee's conclusion that the repayment was necessarily fraudulent because accomplished over 16 minutes and using cashier's checks. That Jonovich would pay J.S. Stephens when Paloma paid it was part of the loan agreement. The use of cashier's checks raises some question about the parties' intent but is not sufficient to tip the scale in favor of avoidance on this ground. Jonovich testified that he had had difficulty in a prior transaction getting checks to clear the bank and that he did not want that to happen again. The Court finds and concludes that the transfer from Food & Fibre is not avoidable under Section 548(a)(1).

### 2. Is the Transfer Avoidable under Section 548(a)(2)?

Regarding § 548(a)(2)(A), the Trustee argues that the transfer is fraudulent because Jonovich took more from Food & Fibre than he paid into it from the money he borrowed. As noted previously, Jonovich testified that, although he kept poor records, he did, in fact, over the eight years he had the company, put more into it than the difference the Trustee disputes. Given the nature of this business, this is credible testimony. Even if not, the Code does not require exact equality but rather reasonable equivalence. The Court finds that the Debtor received reasonably equivalent value for its payment to Jonovich. The Court finds that the transfer from Jonovich to J.S. Stephens is not avoidable under § 548(a)(2).

### C. Is the Avoided Insider Preference Recoverable from J.S. Stephens?

#### 1. Is J.S. Stephens the "Initial Transferee" under the so-call "Conduit Theory"?

A Trustee may recover an avoided transfer not only from the initial transferee but also from certain subsequent transferees down the chain.[14] The Trustee argues that J.S. Stephens was an initial, rather than a immediate or mediate, transferee under Section 550. The Trustee posits that Jonovich was a mere conduit for J.S. Stephens, so that the Trustee may recover the funds from J.S. Stephens as the initial transferee.[15]

The distinction is significant because an immediate or mediate transferee has available to it defenses which are not available to the initial transferee. The subsequent transferee can avoid liability if it can demonstrate that it took for value, in good faith and without knowledge of the avoidabili-

---

**14.** In the words of Section 550, the recipient of the avoided transfer is the "initial transferee," the party to whom that recipient transfers is the "immediate transferee," and any party taking farther down the line is a "mediate transferee."

**15.** The Trustee does not argue that J.S. Stephens is "the entity for whose benefit the transfer was

made" under Section 550(a)(1). Under *Bullion,* this is wise; that case makes clear that "a subsequent transferee cannot be an entity for whose benefit the initial transfer was made, even if the subsequent transferee actually receives a benefit from the initial transfer." 922 F.2d at 548.

ty of the transfer. Section 550(b)(1).[16] The initial transferee is liable without regard to value, good faith or knowledge—if he is first in the chain, he must pay. In this case, even though Jonovich appears to be the initial transferee, the Trustee urges the Court to bypass him and find that J.S. Stephens sits in that unhappy chair.

█ The conduit theory is an equitable doctrine, developed by the courts to avoid unfairness that might result from the literal application of Section 550(a). *Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.)*, 33 B.R. 334 (Bankr.S.D.N.Y.1983). "The person to be charged with liability, if he has parted before that bankruptcy with title and possession, must have been more than a mere custodian, an intermediary or conduit between the bankrupt and the creditor. Directly or indirectly, he must have had a beneficial interest in the preference to be avoided, the thing to be reclaimed." *Carson v. Federal Reserve Bank*, 254 N.Y. 218, 172 N.E. 475, 482 (1930) (Cardozo, C.J.) (federal reserve bank acted as agent for its member banks in collecting funds from an insolvent bank, so was not liable for the funds collected and credited to its members' accounts.) Its purpose is to shift "initial transferee" status down the line of recipients. Applying this equitable doctrine, courts have insulated from liability a variety of fiscal intermediaries. *See, e.g., In re Williams*, 104 B.R. 296 (Bankr.C.D.Cal.1989) (escrow company); *In re Moshowitz*, 85 B.R. 8 (Bankr.E.D.N.Y. 1988) (title company); *In re Machinery & Steel Serv., Inc.*, 112 B.R. 478 (Bankr.D.Mass 1990) (labor union). The court in each case found under the individual facts that the scrutinized entity, which merely facilitated the transfer from the debtor to a third party, was not an "initial transferee" so, therefore, should not be liable for recovery.

█ While its genesis is defensive (to protect an innocent and passive participant from liability), some courts have allowed the conduit theory to be applied offensively (to deprive what appears to be a subsequent transferee of the defenses of Section 550(b)(1)). *See Lowry v. Security Pacific Business Credit, Inc. (In re Columbia Data Products, Inc.)*, 892 F.2d 26 (4th Cir.1989). However, the offensive use has no independent equitable underpinning. Rather, its recognition apparently stems from a need for symmetry and consistency in analysis: when determining whether the trustee can recover a preference payment, the entity's status as a conduit should not change, depending upon who asserts the theory. *See In re Granada, Inc.*, 156 B.R. 303, 310 (Bankr.D.Utah 1990). The Trustee here asserts the theory offensively, attempting to bypass Jonovich as the initial transferee to deprive J.S. Stephens of the benefits of Section 550(b)(1). Since the conduit theory is not grounded in the Code itself, it should be applied carefully and in a limited fashion, particularly where its use is offensive.

█ In determining whether a particular recipient of property is an initial transferee, the Ninth Circuit in *Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544 (9th Cir.1991) has adopted a "dominion" or "control" test. As stated in that opinion, "the minimum requirement of 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes," not merely as an agent for a third party. *Bullion Reserve*, 922 F.2d at 548, quoting *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir.1988). "When A gives a check to B as agent for C, then C is the "initial transferee;" the agent may be disregarded." *Id.* Further, the Court properly sees "beyond the particular transfers in question to the entire circumstance of the transactions." *Bullion Reserve*, 922 F.2d at 548, quoting *Nordberg v. Societe Generale (In re Chase and Sanborn Corp.)*, 848 F.2d 1196, 1199 (11th Cir.1988). A conduit has no legal right to the disputed property, itself. So, in *Bullion Reserve*, the defendant was a mere conduit for stock, not a transferee, because he received stock encumbered by a beneficial interest, with the beneficial interest attaching as the result of the defendant's contractual duty to pledge the

---

**16.** Once a transferee establishes entitlement to this defense, any subsequent transferees are likewise insulated.

stock to that beneficiary upon receipt. 922 F.2d at 544. "[The Defendant] would not become a transferee unless and until he gained the beneficial interest in the stock" from the beneficiary. *Id.*

██ The Utah District Court's analysis in *Granada* is particularly cogent here. In that case, a general partner transferred funds through partnerships to pay obligations of the partnerships to Key Bank. The general partner's trustee sought to bypass the partnerships and recover from the Bank as the "initial transferee," arguing, as here, that the partnerships were mere "conduits." The Court stated,

> The dominion and control test as set out in *Bonded* requires only that an entity have the "right to put the money to [its] own purposes." In the present case, the partnerships had the right and did, in fact, put the money to their own purposes. They used the funds to reduce their debt to Key Bank. In contrast, the conduits in *Bonded* and the cases following *Bonded* had no right, power, or claim of any kind to the funds transferred through them. The partnerships in the present case are not financial intermediaries and couriers in the same way as were the conduits in *Bonded* and the cases following it.

156 B.R. at 308. Similarly, in this case, Jonovich used the money he received to pay his debt to J.S. Stephens just as the partnerships in *Granada* used the money to pay their debts to Key Bank. Conversely, as noted in *Granada*, the existence of a debtor-creditor relationship between the debtor and the alleged conduit (Food & Fibre and Jonovich) tends to disprove conduit status. 156 B.R. at 309.

██ The testimony at trial established that Jonovich was not a passive recipient of funds from J.S. Stephens. He used some of the money he borrowed for personal purposes, unrelated to Food & Fibre. There is no evidence that J.S. Stephens directed how Jonovich was to allocate the funds he received from J.S. Stephens. Further, in light of all the circumstances, the evidence does not show that Sherri Stephens or other agent of J.S. Stephens controlled Jonovich's actions when the time came to pay back. It is true that J.S. Stephens and Jonovich were each, for their own reasons, interested in keeping Food & Fibre in business. This concordance of interests and corresponding actions to serve those interests did not create an agency relationship. While Jonovich was obligated to repay J.S. Stephens in the same way a borrower is obligated to repay money borrowed from a bank to buy a car, this did not make him J.S. Stephens' agent for the purpose of repaying the loan.

██ In arguing liability on behalf of Jonovich personally, in arguing fraudulent conveyance, and in establishing that one year is the applicable preference period, the Trustee emphasized Jonovich's motives and active role.[17] However, if a recipient of money is a conduit, for purposes of preference recovery the conduit is treated as though he did not exist. This raises a clear incongruity in the Trustee's argument. The transfer from Food & Fibre is avoidable *only* because of Jonovich's status as both an insider and a *transferee*. In the absence of either, the Trustee's case would not survive to the second level of analysis. The conduit argument, on the other hand, depends upon a finding that Jonovich was *not a transferee*. This internal inconsistency underscores the inapplicability of the conduit theory to this case.

██ The Trustee would, incorrectly, make a conduit of any party who acted consistently with a legal obligation to pay a creditor. *Bonded* is instructive on this point.

17. Some courts have held that if a debtor's fraudulent transfer is directed by a principal of the debtor, the principal is ipso facto the initial transferee. *See, e.g., Ross v. United States (In re Auto–Pak, Inc.),* 73 B.R. 52 (Bankr.D.C.C.1987); *Robinson v. Home Savs. of America (In re Concord Senior Housing Foundation),* 94 B.R. 180 (Bankr.C.D.Cal.1988). Some of the cases the cases the Trustee relies upon, including *Bullion Reserve* and particularly *IRS v. Nordic Village,* Inc. *(In re Nordic Village, Inc.),* 915 F.2d 1049 (6th Cir.1990), *rev'd* on sovereign immunity grounds, —— U.S. ——, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992), cite to Auto–Pak or Concord when discussing the importance of dominion and control, although not addressing any holding to that narrow issue. The Trustee does not attempt to reconcile the potential contradictions in his arguments.

The bank that had received the funds in *Bonded* was not the initial transferee where the debtor sent its check to the bank with specific directions to place the money in its principal's account, then shortly afterwards, used the funds to reduce his loan balance. The bank, the court stated, would have been the initial transferee if it had received the debtor's funds *for its own account* to pay off the principal's loan from it, rather than just depositing funds in the debtor's account. 838 F.2d at 892. In this case, Jonovich received the debtor's funds for his own account to pay off his own loan. In repaying the loan, it is true that Jonovich acted in accordance with his agreement with J.S. Stephens, both on his own behalf and as president of Food & Fibre, to repay J.S. Stephens after Paloma paid Food & Fibre. However, J.S. Stephens had no legal or equitable interest in the payment from Food & Fibre to Jonovich, itself. Jonovich had the legal right to control, and did control, to whom the bank issued the cashier's check from himself; he was not limited by a legal duty to transfer the funds to J.S. Stephens. Jonovich had dominion over the money and, therefore, became a transferee, when Food & Fibre paid him. The Court finds that under the facts of this case, Jonovich, an initial transferee, was more than a fiscal intermediary, agent for a third party, or mere conduit. J.S. Stephens, as the result, is the immediate transferee of an initial transferee, whose liability must be further analyzed.

### D. Good Faith Defense

■■■■ The trustee may not recover from an immediate transferee "that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." [18] *See* 11 U.S.C. §§ 550(b)(1) and (b)(2). The good faith and lack of knowledge requirements are meant to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, then receiving a retransfer to him—that is, "washing" the transaction through an innocent third party. House Report No. 95–595, 95th Cong., 1st Sess. 375–76, U.S.Cong. & Admin.News 1978, 5787, 6332. As the party raising these defenses, J.S. Stephens bears the burden of proof. *See Bonded Financial Servs. v. European Am. Bank,* 838 F.2d 890, 892 (7th Cir.1988).[19]

■■■■ With respect to J.S. Stephens, the Trustee argues that J.S. Stephens cannot be a good faith transferee because it lent Jonovich money knowing that Food & Fibre and Jonovich both had a cash flow problem. In the farming business, cash flow problems during the growing season are routine and may be cured by sale of the harvest. The Stephens were unsurprised that Food & Fibre had a cash flow problem as they knew its customers, *including their own farms,* could not pay until after the harvest, and then only if enough of the crop survived—a feat for which pesticides were essential. Food & Fibre was habitually thinly capitalized, but had managed to stay in business for eight years; Russell Stephens credibly testified that it expected Food & Fibre to continue in business and that, as far as he could tell, Food & Fibre was operating as it always had. Indeed, Food & Fibre might well have continued to do so, had UAP not seized its receivables. There is no evidence that J.S. Stephens had, on February 12, 1992, the date of the transfer, any reason to believe that Food & Fibre was operating other than as usual or that it knew UAP was planning action that would jeopardize Food & Fibre's ability to stay in business. The Court finds that, under these circumstances, J.S. Stephens did not have knowledge of the voidability of the transfer and acted in good faith. Accordingly, J.S. Stephens is shielded from liability for the recovery of the avoided insider preference pursuant to 11 U.S.C. § 550(b)(1).

---

**18.** The Trustee does not contest that J.S. Stephens took for value.

**19.** In *Etchegoyen v. Hammill (In re Farmer's Market),* 22 B.R. 71 (9th BAP Cir.1982), cited by Stephens, the BAP did not hold that the trustee has the burden of overcoming a good faith defense; instead, it held that the state law burden of proof standard should be applied in determining the validity of a foreclosure sale. Federal law applies here.

Counsel for J.S. Stephens is directed to prepare a proposed form of judgment consistent with this opinion and serve it upon Trustee's counsel for approval as to form. If the parties cannot agree on the form of the judgment within 5 days of the date of this order, counsel for J.S. Stephens is directed to lodge its proposed form of judgment with the Court and the Trustee shall have 5 days thereafter to file any objection.

**SO ORDERED.**